**In re JHG, a child.**

No. 05–08–00875–CV.

Court of Appeals of Texas, Dallas.

May 25, 2010.

J. Matthew Goeller, Plano, for Appellant.

Malcolm Miranda, John R. Roach Sr., Collin County Dist. Attorneys, McKinney, for Appellee.

Before Justices BRIDGES, O'NEILL, and FITZGERALD.

**OPINION ON REMAND**

Opinion by Justice O'NEILL.

On remand from the Supreme Court of Texas, we consider whether the evidence is legally and factually sufficient to support a jury's determination that termination of parental rights is in JHG's best interest.[1] We affirm.

---

1. In our original opinion, we concluded the trial court erred by not dismissing the proceeding on the dismissal date. *See In re J.H.G.,* 290 S.W.3d 400 (Tex.App.-Dallas 2009, pet. granted). The Supreme Court of Texas disagreed and reversed our decision with instructions on remand to consider appellant's remaining issues because Mother

## Background

On March 14, 2007, Mother went to an emergency room complaining of abdominal pain and vaginal bleeding. Doctors determined she was in labor. Mother, who was twenty years old, claimed she was unaware she was pregnant. Due to complications involving the position of the baby, Dr. Cesar Reyes performed a c-section and delivered baby boy JHG.

While recovering in the hospital, staff became concerned because of Mother's lack of bonding and interaction with JHG. They were also concerned because Mother first stated she did not want JHG, then she said she wanted to give him up for adoption, and later said she wanted to keep him. Based on her actions and these statements, Dr. Reyes ordered a social services consult.

Child Protective Services (CPS) became involved in the case and ultimately took custody of JHG when he left the hospital and placed him in foster care. CPS created a service plan to assist Mother in regaining custody of JHG because its original goal was family reunification. Mother complied with the provisions of the service plan during the first few months, but her behavior changed around July of 2007. CPS's goal then changed to termination of parental rights.

In June of 2008, a jury answered "yes" to Mother's failure to comply with the provisions of a court order that established the actions necessary to obtain return of JHG and answered "yes" that termination of parental rights was in the child's best interest. On appeal, Mother only challenges the sufficiency of the evidence to support the jury's finding of termination based on best interest of the child. We will detail further relevant evidence below in our review.

## Standard of Review

In reviewing the legal sufficiency of the evidence to support a termination finding, we look at all of the evidence in the light most favorable to the termination finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction about the truth of the matter on which the Department bears the burden of proof. *In re J.L.*, 163 S.W.3d 79, 84–85 (Tex.2005); *In re E.S.C.*, 287 S.W.3d 471, 474 (Tex.App.-Dallas 2009, pet. denied). We assume the factfinder resolved any disputed facts in favor of its finding, if a reasonable factfinder could so do, and disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *In re E.S.C.*, 287 S.W.3d at 474. We do not, however, disregard undisputed evidence that does not support the finding. *Id.*

In reviewing the factual sufficiency of the evidence, we must give "due consideration" to any evidence the factfinder could reasonably have found to be clear and convincing. *Id.* We must consider the disputed evidence and determine whether a reasonable factfinder could have resolved that evidence in favor of the finding. *Id.* If the disputed evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

## Applicable Law

Before parental rights can be involuntarily terminated, the factfinder must find by clear and convincing evidence that: (1) the parent has committed one of the enumerated statutory grounds, and (2) ter-

failed to include in her statement of points for appeal that the trial court unlawfully extended the statutory deadline for dismissing the case. *See In re J.H.G.*, 302 S.W.3d 304 (Tex. 2010).

mination is in the best interest of the child. Tex. Fam.Code Ann. § 161.001 (Vernon 2008); *In re E.S.C.*, 287 S.W.3d at 474; *see Wilson v. State*, 116 S.W.3d 923, 928 (Tex. App.-Dallas 2003, no pet.). Here, the factfinder terminated Mother's parental rights under section 161.001(1)(O) of the family code. Tex. Fam.Code Ann. § 161.001(1)(O) (Vernon Supp.2009) ("... failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child ..."). However, Mother does not challenge this finding, but rather only challenges the jury's finding that termination was in JHG's best interest.

An extended number of factors have been considered by the courts in ascertaining the best interest of the child. Included among these are the following: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.1976). This list is by no means exhaustive, but does indicate a number of considerations that either have been or would appear to be pertinent. *Id.*

### JHG's Desire

JHG was too young to articulate his desires. However, Karen Nelson, a consultant for the Center for Psychological Development, conducted an attachment assessment of Mother and JHG. She testified JHG never treated Mother as if she was the person who was supposed to keep him safe. If he was startled by something or upset, he looked to the CASA volunteer for comfort. JHG showed no signs of attachment to Mother as a care giver and in fact showed "attachment distress," meaning he sucked more intensely on his pacifier in Mother's presence and engaged in looking away behaviors. Nelson said Mother tried to engage JHG, but was unsuccessful. Nelson also noted that when Mother picked up JHG, he kept his arms outreached rather then cuddling into her. She described their interaction as "more of a ritualized kind of interaction that had no emotion in it at all."

Amy Harris, JHG's foster mother, described him as very "cuddly" and said he usually made eye contact. However, he did not want anything to do with strangers. She also said when JHG saw the case worker at his day care, he got upset and did not want to leave with her.

Deborah Pendergrass, a CPS worker, also testified JHG did not interact with Mother during her visits, but acted "somber" and would "look away." She noted he would cry when picked up for visits. Thus, JHG's behaviors indicate return to Mother would not be in his best interest.

### Emotional and Physical Needs of JHG Now and in the Future

The evidence shows Mother is incapable of taking care of JHG's emotional and physical needs now and in the future. From the very beginning, hospital staff was concerned about Mother's interest in her son. After his birth, she first said she did not want to keep JHG, then she said she wanted to keep him but family and friends would help her. In addition to these inconsistent statements, she waited three days to name the child.

The few times she visited JHG in the nursery, she was expressionless and made no eye contact. Diana Flores, a labor and delivery scrub technician, and Angela Katterman, the nurse on duty when Mother visited the nursery, both testified they had never seen a mother act in that manner. There was no interaction between them, and she looked everywhere around the room except at JHG. Katterman admitted Mother was not hurting JHG in any way, but she certainly was not providing for his emotional needs. Lynn Demaria, a staff nurse for twenty years, also noted Mother's visits were brief, she made no eye contact, and did not appear to be bonding with JHG.

Mother testified she did not remember telling anyone that she did not want JHG. She said she was medicated during her conversations and although she understood the nurses "more or less," she asked her cousin to translate for her. She also testified she wanted to hold JHG longer in the hospital, but it hurt her arms because they were swollen from IVs. She further said she repeatedly asked to see JHG but no one would take her.

When JHG was discharged from the hospital, he went into CPS custody and CPS quickly placed with a foster family. CPS then created a service plan for Mother to regain custody, and she appeared to be making some improvements. She attended counseling and parenting classes. She visited JHG twice a week for an hour and brought appropriate gifts to him. However, during some of the visits she still appeared emotionally detached. Ray Frausto, a special investigator with CPS, observed two visits between Mother and JHG a few months apart and he reported seeing no change in bonding. Mother had

the same flat affect on her face and did not interact much with JHG.

The psychologist who evaluated Mother had difficulty getting her to answer questions. In fact, by the end of his session, he stated he had more questions regarding Mother's abilities than answers and recommended parenting classes and individual therapy before CPS should consider returning him to her custody. He also noted Mother never used JHG's name during their session.

Mother lived in three different places during the investigation, which showed instability. She failed to notify CPS of these moves. She also had a pattern of getting involved with men for short periods of time. At the time of trial, she had been in a relationship with the same man for six months, which showed some stability. However, Felipe was married and estranged from his current wife and had children of his own.[2] In fact, evidence showed what little improvement Mother had made in bonding with JHG declined in July, which was near the time she got involved with Felipe. This seemed to indicate her relationship with him was more important than her relationship with JHG.

In July 2007, Mother was not talking to JHG as much and generally seemed disengaged. She also started asking again how to make bottles, despite having done it for the previous months.

In January 2008, Mother requested to change visits from two times a week for an hour to once a week for two hours. She also asked if the location of the visits could be changed because she was having transportation issues. However, when CPS accommodated her request, Mother began cancelling visits. From January to May,

---

**2.** Mother originally denied any romantic relationship with Felipe, but she eventually admitted it.

she cancelled nine visits despite being within a mile of the meeting location. We acknowledge Mother only missed twelve out of sixty-five visits; however, the last nine were in the months leading up to trial and when the location was moved to accommodate her. This indicates Mother was not making every effort to show return of JHG to her was in his best interest.

In February, CPS made an unannounced visit to Mother's home. She had not baby-proofed the home, and there was nothing in the home for JHG except for a stroller with a carrier that was in the back of a closet. When CPS visited again in May, there was a crib and some other baby essentials.

During visits, Deborah Pendergrass testified she observed Mother engaging in "parallel play," which means she and JHG were in the same room playing, but not really playing with each other. She recognized that Mother said she wanted JHG back; however, she testified her behavior said she really did not want him. Her "behaviors are speaking louder than her words." She was worried that Mother was not incorporating the lessons she learned from her parenting classes. Mother did not seem to be able to anticipate his needs. For example, one time it was clear JHG wanted to play with a truck and was trying to get to it, but Mother kept pulling it away. Mother testified she knew he wanted it, but she thought it was too big for him and did not want him to get hurt. Pendergrass viewed her actions differently.

Nelson observed a time when Mother kept feeding JHG when he clearly was no longer interested in eating. She testified Mother did not know how to respond to his cues.

Mother also showed an unwillingness to support JHG financially. She stopped paying child support in December 2007, claiming her work hours had been cut. Her paychecks, however, showed she was still working over forty-hours a week. Further, she testified Felipe was willing to help her financially, but when he gave her money, she used it to buy clothes and a television rather than paying child support.

Mother did not have a good support system to help her. Her family lived in Mexico, and she no longer spoke with her cousin who lived nearby. She also did not have any close friends to help her.

Despite making progress in her attempts to provide for JHG's emotional and physical needs during the first few months of working on her services, Mother's behaviors changed after six months and never improved. Thus, the evidence shows she was incapable of adequately providing for JHG's emotional and physical needs now and in the future.

### Emotional and Physical Danger to JHG Now and in the Future

Although nothing in the record indicates return of JHG to Mother would result in any physical danger, there was testimony that a lack of parental bonding was indicative of future neglect. The evidence, as discussed above, indicates more of an emotional danger for JHG if returned to Mother. She had difficulty interacting with JHG and forming any kind of emotional bond.

A strong emotional bond between parent and child is necessary because it forms the basis of other relationships in the child's life. Karen Nelson testified JHG suffered from "attachment distress." She specifically said, "When you don't move in the direction of security and the pathway continues to be one that has distress, that in some sense emotionally contaminates everything else that is going on for the child

over the course of the next several years of life." She recommended JHG's visits with Mother stop entirely, which is a "very rare" step for her to take. She only made such recommendations when she felt it was a disadvantage to the child to continue them. Thus, this factor favors termination was in JHG's best interest.

### Parental Abilities of Individuals Seeking Custody

Charles and Amy Harris were JHG's foster family and took custody of him when he was five days old. She is a teacher and he is a worship pastor at a local church. They have two daughters and have been foster parents willing to adopt for several years. In fact, they adopted a two-year-old son who they first took in under foster care. From the beginning, they were willing to adopt JHG. They both testified their children doted on JHG and he returned their affection. Their previous experiences with raising three children would help them raise JHG.

They recognized the importance of teaching JHG about his Hispanic heritage and sought age appropriate toys in both English and Spanish. Charles grew up in a South Texas town with a sixty percent Hispanic population, and he had an interest in learning more Spanish.

Zulma Santiago, JHG's guardian ad litem through CASA, visited JHG approximately six times while in foster care. She testified he was in a safe and stable environment with the foster family. She further said she believed it was in JHG's best interest to terminate. Thus, the Harris family provided evidence they could provide JHG with a stable and loving home.

Mother, on the other hand, was not consistent in her parenting abilities. She had to ask how to make bottles and did not interact appropriately, as discussed above. She did not have any family to help her and depended on receiving help from a man estranged from his wife, who had his own children to take care of. Based on this evidence, the jury could determine termination was in JHG's best interest.

### Programs Available to Promote the Best Interest of JHG

Mother participated in some services through CPS. She attended counseling sessions with Maria Parides; however, she did not finish them. She completed her psychological assessment and parenting classes. CPS had concerns though that Mother was not incorporating what she learned in her parenting classes into her care for JHG. She seemed to be going through the motions and as Deborah Pendergrass stated, the service plan is not a chore list but rather provides tools for the parent to use. After her psychological assessment, Bret Baldwin stated major improvements were needed before returning the child. Although she first appeared to make improvements, her attention and interest in JHG seemed to change about the time she became involved with Felipe.

Thus, although CPS provided programs to assist Mother in her care and interaction with JHG, she did not take full advantage of them nor show that she would use them to care for JHG.

### Plans for JHG

Mother was repeatedly asked about her plans for JHG but gave little more detail than a vague desire to raise him and teach him her native language. She said she planned to leave JHG with the woman who takes care of Felipe's children, but she did not know if she was a licensed day care provider or if she was even willing to take care of an additional child. Mother claimed she could support JHG despite not paying child support for the previous six

months. She also said she could find a better paying job, but admitted she had not had any luck in finding one.

JHG's foster family was a licensed foster to adopt home and interested in adopting him. JHG attended a day care near their home, and they had the ability to stay home with him if he was sick. They also testified they were interested in teaching JHG about his heritage and made an effort to buy bilingual toys. His foster father also stated the family was interested in learning Spanish. Thus, the jury could consider this evidence and conclude the Harris family had a more defined plan for JHG's future than Mother.

## Stability of Proposed Placement

Throughout the trial, the jury heard evidence that Mother would likely fail to provide a stable environment for JHG. She seemed to quickly form relationships with individuals she did not know well and just as quickly discard them. She knew JHG's father for approximately a month before she got pregnant, but the relationship did not last. In fact, the father never even knew she was pregnant. Her only family in the country was a cousin, who she no longer spoke to. At one point during her services, she moved in with a woman that she had known for about two weeks and failed to tell CPS of the move. She moved out approximately two months later and was not speaking to the woman at the time of trial. After she started dating Felipe, she moved in with him after a month. Although the relationship appeared more stable and had lasted longer than her previous relationships, the jury could still conclude her relationship with Felipe would be just as fleeting as her previous relationships. Further, they could consider the fact that Felipe was still married and in a custody dispute over his own children.

These facts weigh against Mother providing a stable home for JHG.

By contrast, the Harris family provided stability for JHG. They had been married for thirteen years and had two natural children and one adopted child. They had stable jobs and already had child care for JHG while they worked. When JHG had recurring ear infections, they made sure he received proper medical care and took care of him when he needed tubes put into his ears. They also took him to a motor therapist for some developmental difficulties. Thus, the evidence showed the Harris family could and was willing to provide a stable environment for JHG. Further, JHG was bonded and thriving under their care.

## Acts or Omission of Parent Indicating Existing Parent–Child Relationship is Improper

We have detailed above that Mother often did not know how to interact appropriately with JHG. She had a flat affect and did not seem excited to see him when she arrived for her visits and showed no emotion when she left. Although she tried to play with him, it was described as "parallel play," meaning they were not really playing together. After several months, she had to ask again how to prepare bottles. Witnesses testified she simply did not know how to anticipate his needs. These acts and omissions weigh in favor of termination.

## Any Excuse for Acts or Omissions by Mother

Mother's main excuse for her difficulties was her language barrier. However, she was provided numerous interpreters and Spanish speakers to help her understand the process while she worked on her service plan. Witnesses that interacted with Mother testified it never appeared she had

difficulty understanding them. The record also shows Mother answered at least one question during trial before the translator translated it for her.

She also complained she had difficulties attending the scheduled visits because of transportation. However, CPS worked with Mother to reschedule visits to accommodate her schedule and assigned a volunteer to help transport her to appointments. CPS also changed the location of visits to within one mile of her home. However, Mother missed the majority of visits when they were closer to her.

She further complained that people misunderstood her because she was serious. She said someone may have made up that she said she did not want JHG "because of the way I am." When asked if she thought people made up things about serious people, she said yes. The jury could however interpret Mother's answers as evidence of her unwillingness to take responsibility for her behavior.

## Case Law Relied on by Mother

Mother relies on two cases to argue termination is not in JHG's best interest. In *In re S.A.P.*, the Waco Court of Appeals, with a strong dissenting opinion from Chief Justice Gray, held evidence was legally and factually insufficient to support termination was in the child's best interest despite the following: (1) Father had a diagnosed narcissistic disorder; (2) He had difficulty putting his children's needs first; (3) He believed all his problems stemmed from TDPRS rather than his actions; and (4) He was working full time but had recently been fired from three jobs. They weighed this evidence against the follow-

ing: (1) Father had no problems with drugs; (2) He participated in all his services required by CPS even though he was sometimes inconsistent; (3) He loved and interacted appropriately with his child on visits; (4) His conduct during visits was positive; and (5) He provided a stable home. *In re S.A.P.*, 169 S.W.3d 685, 710–11 (Tex.App.-Waco 2005, no pet.).

Despite some factual similarities between the present facts and *In re S.A.P.*, we conclude the case is distinguishable. Here, several people who observed Mother's interactions during her visits testified she did not interact, play, or anticipate JHG's needs. She failed to complete her counseling sessions and cancelled many of her final visits. Her past actions of living with people she knew for only a short time and moving frequently showed she was unable to provide a stable home for JHG. Thus, we are not persuaded by Mother's reliance on *In re S.A.P.*

She also relies on *In re W.C.* to support her argument that her actions are not nearly as egregious as appellant in that case, in which the court reversed a finding that termination was in the child's best interest. *In re W.C.*, 98 S.W.3d 753, 756 (Tex.App.-Fort Worth 2003, no pet.). While we agree that appellant's past behavior in *In re W.C.* was more problematic,[3] the court reasoned that reversal was necessary because appellant had done everything CPS had requested of her and had made great improvements in her life. *Id.* at 762. She had the support of her mother and aunt to help her with the children, and numerous witnesses testified that after observing her visits with the children, it was clear that she was bonded

---

**3.** The mother in *In re W.C.* continually allowed her children to remain in an environment where they experienced both physical and sexual abuse at the hands of their father. 98 S.W.3d at 756, 758–59. Even after the

father was arrested for abuse and spent time in prison, the mother allowed him to return home upon his release. *Id.* at 758. Once CPS intervened, the mother eliminated her involvement with him. *Id.* at 764.

to them and they returned the affection. *Id.* In fact, they "flocked to her" when she arrived and then screamed and had to be drug away from her when it was time to leave. *Id.* Further, there was evidence that CPS had told appellant she was getting her children back and to make preparations. *Id.* at 766. There was no significant event between this statement and when CPS sought termination.

Here, the evidence showed Mother and JHG were not bonded. She had no family or support system to help her. And although she did comply with most of her service plan and made improvements at the beginning, she regressed after six months into her services and no longer made improvements. Further, although CPS's original goal was reunification, the plan later changed to termination. Thus, unlike *In re W.C.*, CPS never specifically told Mother she would get JHG back. As such, we are not persuaded by Mother's reliance on this case.

We find *In re J.M.* to be more persuasive. *In re J.M.*, 156 S.W.3d 696 (Tex. App.-Dallas 2005, no pet.). In that case, the court held evidence was sufficient to support the jury's finding that termination was in the best interest of the child when the father did not have a good support system, had not made significant improvements during his services, and had difficulty with basic parenting tasks like changing a diaper or understanding the importance of the expiration date on baby food jars. *Id.* at 707. The foster family involved was willing to adopt the child and proved their parenting ability by raising their own children. Their home was also stable. *Id.* at 708.

These facts are similar to Mother's situation. As repeatedly noted, Mother did not have any support system and she did not consistently improve during her services but rather regressed. She had to be reminded on occasion how to make bottles. And similar to *In re J.M.*, the Harris family is a stable, foster family willing to adopt JHG. Despite Mother's assertion in her brief that she "tenaciously fought for her son" for fifteen months, the record shows otherwise.

### Conclusion

After reviewing the evidence under the *Holley* factors and applying the appropriate standards of review, we conclude the jury could find by clear and convincing evidence that termination of Mother's parental rights was in the best interest of JHG. Thus, the evidence is legally and factually sufficient. We overrule Mother's two issues and affirm the trial court's judgment.