

# NUMBER 13-19-00539-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE INTEREST OF A.B., G.B., L.B., S.B., AND K.B., CHILDREN

**On appeal from the County Court at Law
of Aransas County, Texas.**

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Perkes
Memorandum Opinion by Justice Perkes**

Appellants E.B. (Father) and B.B. (Mother) challenge the termination of their

parental rights to their five children, A.B., G.B., L.B., S.B., and K.B.[1] *See* TEX. FAM. CODE

---

[1] To protect the identity of minor children, we utilize aliases for the children and related parties. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

Mother and Father have six children, however, only five children are parties to this suit. The parents voluntarily and informally relinquished their rights to their sixth child. The child has lived with his paternal grandmother out-of-state since he was one month old; he is now five years old. At the time of the termination hearing, A.B. was eight years old, G.B. was seven, L.B. was four, S.B. was three, and K.B. was one.

ANN. §§ 161.001(b)(1)(D), (E), (b)(2). By what we construe as two issues, Father and Mother argue: (1) the trial court erred in its denial of a requested six-month extension of the dismissal deadline; and (2) the evidence is legally and factually insufficient to support findings that Father and Mother committed one or more statutory predicate acts or omissions under family code § 161.001(b)(1) or that termination is in the children's best interest. *See id.* We affirm.

## I. BACKGROUND

On October 15, 2019, the trial court presided over the termination hearing. Prior to the hearing, the court heard arguments on Mother and Father's joint motion for extension, before ultimately denying the motion.

Sandra Lopez, an investigator with appellee, the Department of Family and Protective Services (the Department), first intervened on November 2, 2018, after receiving a priority referral in reference to S.B. "The report indicated that [Father] had notified [the] daycare that [S.B.'s] arm was broken," said Lopez. Later that same day, Lopez visited Father and Mother's residence accompanied by law enforcement.[2] Mother claimed S.B. had injured herself at daycare and she planned on taking S.B. to the doctor the following day. Because Father and Mother had not sought medical intervention in the three days since the alleged injury, the Department initiated emergency removal of all five children, citing medical neglect and neglectful supervision. The Department transported S.B. to a nearby hospital, and S.B. was initially diagnosed with having a fractured

---

[2] According to Lopez, Father had a "history of acting out," and the Department was familiar with Father and Mother, having just closed out a case one-month prior in October 2018. The Department initially intervened in March 2018 after K.B. was born, when the child tested positive for marijuana. Father and Mother also have a history with child protective services in Florida due to drug use and homelessness.

humerus by the emergency room physician and received a temporary cast. However, it was later determined that she had a "nursemaid's elbow,"[3] and physical abuse was ruled out. After the initial basis for removal, medical neglect, was found to be unsubstantiated, the Department modified the family's service plan to address the children's unsuitable living conditions and parents' continued substance abuse issues. Both parents participated during the family plan service meeting; however, Father participated via telephone conference because he was in jail in Florida for cashing a fraudulent check.[4]

Lopez testified that the family resided in a one-bedroom R.V. trailer in Rockport, Texas. A.B. and G.B. shared bunk beds situated below a collapsing rooftop; L.B. and S.B. shared a futon; and the youngest child, K.B., who was nine months old at the time, slept on the floor underneath a table. Lopez described the residence as "musty," smelling of "urine," "feces," and "cigarette smoke." The trailer had sustained roof damage, the "[air conditioning unit] had fallen in and created a hole," and the residence lacked running water. Father and Mother were instructed to rectify the safety hazards and improve the children's living conditions.

Valerie Moretish, a Department caseworker, testified that both parents were also required to participate in random drug testing and attend substance abuse counseling, which was held at their home because neither parent owned nor had access to a vehicle. In February 2019, Father and Mother began substance abuse counseling. They stopped

---

[3] "Nursemaid's elbow is a dislocation of a bone in the elbow. . . . Dislocation means the bone slips out of its normal position. Nursemaid's elbow is a common condition in young children, especially under age 5. The injury occurs when a child is pulled up too hard by their hand or wrist." MedlinePlus, *Nursemaid's elbow*, U.S. NAT'L LIBR. OF MED., https://medlineplus.gov/ency/article/000983.htm (last visited Feb. 6, 2020).

[4] Father was in jail pursuant to an outstanding warrant. The parties did not discuss how long Father was incarcerated and what impact, if any, his incarceration had on his ability to complete services. Father is currently on probation for eighteen months.

3

counseling services in April 2019 and resumed two weeks before the termination hearing in October 2019. According to Moretish, Mother tested positive for marijuana in November 2018, negative for marijuana in December 2018, positive for marijuana between January and May 2019, and negative for marijuana in June and August 2019. Mother did not submit to drug testing in July 2019, and the Department did not ask Mother submit to drug testing in September or October 2019. Meanwhile, Father continued to test positive for marijuana from November 2018 until July 2019; Father also tested positive for cocaine in November 2018 and again in late-December 2018. Father tested negative for drugs in July 2019, September 2019, and October 2019; Father did not submit to testing in August 2019.

Linda Escobedo, a Department assistant caseworker, testified that Father's unstable mental condition and history of belligerent outbursts are additional causes for concern. Escobedo claimed she had witnessed Father publicly berate Mother on several occasions. In one instance, Mother had brought little toys for the children during a visitation, and "apparently [Father] didn't like that, . . . [a]nd he got really upset, and they started cussing at each other." Moretish testified to a separate incident in April 2019, wherein Moretish was transporting Mother and Father to a visitation. Moretish said she was forced to pull over after Father began "yelling at [her] in the car and [] threaten[ing] to blow up buildings and kill himself." Father's statements, according to Moretish, were in response to Moretish telling Father that the Department would be changing the service plan goal to unrelated adoption if the parents continued to test positive for drugs and fail to make the necessary improvements to the home.

According to Laura Morales, a licensed professional counselor, Father suffers from

4

"[b]ipolar disorder, major depression, intermittent explosive disorder, [and] ADHD." Father was referred to her in 2018, and again in 2019 for an "[u]ntreated mental illness, anger, [and] poor communication between him and [Mother]." Morales testified that she saw the couple for five or six sessions in 2018, before the couple "kind of disappeared." Father returned for treatment in July 2019. When asked by the Department whether Father "seem[ed] willing to learn any skills to manage his anger," Morales opined, "I think in time he is probably capable, but did he say, [']Yeah, I want to learn?['] No." During cross-examination, Morales maintained she felt her sessions with Father were unproductive. "[I]t's really hard to work with someone to get them calm and use better coping skills when they are volatile and every little thing triggers that. You've got to stabilize them," explained Morales, emphasizing Father's need for pharmaceutical intervention, which he repeatedly declined.

Morales also testified to the developmental effect on a child's emotional well-being when a child "witness[es] a lot of anger and negative interactions between parents." Morales testified, for example, that G.B. was referred to counseling at six years old after being expelled from elementary school for threatening to take "a gun to school, [and] sa[ying] he was going to kill everybody there."

Morales expressed apprehension over Mother's mental health as well, describing Mother as overwhelmed and depressed. Although Morales suspected domestic violence in the home, both parents denied any history of physical abuse. Morales said she based her suspicions on Mother's "demeanor and how afraid [sic] to speak up and say anything." Mother vocalized her emotional dependence on Father and her struggle to independently parent her children, said Morales. "[S]he would say, 'I just can't do this without [Father].

They don't listen to me. They only listen to him.'" Escobedo witnessed Mother's frustrations first-hand. "[T]here are times when I was taking her [to visitations] on her own without him and she was very, very frustrated. She couldn't give everybody the attention." Escobedo said Mother would have a "melt down in the restaurant and be yelling and screaming that she can't do this." Moretish testified that Mother teetered between "just sit[ing] there and not really engag[ing]" with her children and "leav[ing] [Moretish] to watch her children" for her. "And so we're trying to keep the kids in line [during visitations], and we would provide the discipline for them," said Moretish. Father echoed sentiments shared by Moretish and the counselor at trial. Father described Mother as "depressed" and voiced concerns about Mother managing the children on her own. Mother, although present in the courtroom, did not testify.[5]

Father testified that he made significant strides in the last "four weeks" before trial to address his mental health, become more fiscally responsible, and make the necessary improvements to his home, such as completing the roof repair and fixing the leak in plumbing so water could be turned on.[6] Construction to repair the hole in the wall left by a collapsing air conditioning unit remains on-going, however. Father testified that he now has money to "purchase new mattresses for the kids"—including a temporary play pen for the youngest child so that she no longer has to sleep on the floor—but he had not yet made any purchases. Father said he was working on getting a 40-foot R.V., which would

---

[5] Father explained that Mother had been taken to the emergency room the day before trial due to a "serious mouth infection" and was unable to speak. Father said, "[Y]ou can see her front lip upper nose area or lower nose area is very swollen." Father testified Mother had "broken" her teeth trying to "pull the zipper" on a tent, and her mouth had "got[ten] infected." Father denied physically abusing Mother.

[6] The Department confirmed that Father had replaced the roof panels, and the residence now had running water.

provide ten feet of additional living space for the family so "everybody would have a place to sleep," but "[i]t's not guaranteed" and contingent on the landlord "kicking people out of" it first. Regarding the couple's finances, Mother has been continuously employed since the Department first intervened and remains the primary breadwinner.[7] Father testified he is starting his own bike repair service shop, work has been "steady for a bike shop," and he is in talks with the Rockport Police Department to work as a contracted bicycle repairman.

Father addressed the Department's depictions of him as an unstable aggressor:

> I mean, excuse my language, I'm an a**hole, I know that. I'm very firm with my kids. I don't know why everybody says I'm always angry, maybe it's just my face, I don't know, but I'm not always angry. I'm angry with the situation . . . . I mean, I'm not the best husband, I'm not the best father, but I darn sure try.

Father, thirty years old at the time of the hearing, acknowledged he has struggled with mental illness since he was a teenager. "When I was 15 years old[,] I would wake up in the morning and have to take 16 pills right when I woke up, and the rest were throughout the day." Father said he stopped taking medication in his late teens after a seizure left him in a coma for four days. However, Father acquiesced that failure to control his anger could "[i]n the long-term" negatively affect his children. Father claimed he would continue counseling and begin taking prescribed medication again if it meant his children would return home.

The children were jointly placed in a foster home in Louise, Texas, after the Department was unable to find suitable relative placement. Moretish reported that the

---

[7] Moretish testified that Father had been employed at a restaurant several months prior, but "his manager was doing something he didn't like, so that started an argument and [Father] left that job."

children were "doing very well" in their current placement.[8] All five children are meeting their developmental milestones and doing well in school, with the exception of G.B., who had to repeat the first grade. Moretish noted the most prominent change was in A.B., who no longer appears withdrawn and sad. Moretish said A.B. expressed that "she wanted to stay where she was with her siblings" in foster care. "[A.B.] said that she didn't want to go back [with her parents] and she didn't want to be treated the way she had been treated."

Chris Yackle, the children's foster father, testified that A.B. witnessed her parents "scream and hit each other." On one occasion, A.B. reportedly saw her Father "punch[] her mom in the nose," and the child described "a lot of blood coming out of [Mother's] nose." A.B. told Yackle she knew her parents did drugs, she described what the drugs looked like, and knew they would hide them whenever "C.P.S. came." A.B. also complained of their prior living conditions; because the home lacked running water, the children never brushed their teeth and bath time occurred once a week at a neighbor's house. A.B. had also seen her parents "making babies."

Yackle stated that he and his wife had bonded with all five children and were open to adopting. Although G.B. currently resides in Florida, Yackle said they "would be willing to travel maybe twice a year for face-to-face visits, and letters, anything like that" to maintain the sibling relationships if G.B. were to remain in Florida.[9]

The trial court determined by clear and convincing evidence that appellants committed predicate acts and omissions under Texas Family Code § 161.001(b)(1)(D)

---

[8] One week prior to the termination hearing, G.B. was removed from his foster placement and placed with his paternal grandmother in Florida, joining his sixth sibling, who is not a part of this suit. Neither party elaborated on the reason for the child's transfer.

[9] Moretish testified that the paternal grandmother was seeking to adopt G.B., initiating proceedings out-of-state.

8

and (E), and that termination was in best interest of all five children. *See id.* §§ 161.001(b)(1)(D), (E), (b)(2). This appeal followed.

## II.     MOTION TO EXTEND

Father and Mother first argue that the trial court abused its discretion in denying their motion to extend the dismissal deadline. *See id.* § 263.401.

In a parental termination suit,

> [u]nless the court has commenced the trial on the merits or granted an extension under Subsection (b) or (b-1), on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court's jurisdiction over the suit . . . is terminated and the suit is automatically dismissed without a court order.

*See id.* The trial court may extend the dismissal deadline only if the movant shows that "extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child." *Id.* § 263.401(b). The focus in an extension hearing is on the needs of the child. *In re A.J.M.*, 375 S.W.3d 599, 604 (Tex. App.—Fort Worth 2012, pet. denied) (en banc). Actions that are "considered to be the parent's fault" will generally not constitute an extraordinary circumstance. *In re O.R.F.*, 417 S.W.3d 24, 42 (Tex. App.—Texarkana 2013, pet. denied).

We review a trial court's decision to grant or deny an extension of the dismissal deadline under the abuse of discretion standard. *In re T.T.F.*, 331 S.W.3d 461, 476 (Tex. App.—Fort Worth 2010, no pet.). Under an abuse of discretion standard, an appellate court may reverse the trial court's ruling only if the trial court acted without reference to any guiding rules and principles, such that its ruling is arbitrary and unreasonable. *Id.*

9

Here, on the evening before the termination hearing, Father and Mother filed a "Motion to Retain Suit on Court's Docket and Set New Dismissal Date." The written motion argued summarily, without reference to any specific facts, that "[e]xtraordinary circumstances necessitate the children remaining in the temporary managing conservatorship of the Department." The trial court considered the motion on the morning of the termination hearing. Father and Mother's counsel argued that they (1) completed their initial service plan of service, but (2) needed more time to complete additional services that were requested of them three months prior.[10] The trial court denied Father and Mother's motion.

We cannot find that the trial court abused its discretion. Based on this record, Father and Mother requested an extension because they needed more time to comply with service plan requirements, but no reason for their delay was provided, and there was no evidence of extraordinary circumstances that would necessitate an extension of the dismissal deadline. *See In re D.W.*, 249 S.W.3d 625, 648 (Tex. App.—Fort Worth 2008, pet. denied) (holding that because mother presented no evidence when she presented her motion to extend the dismissal deadline, the trial court did not abuse its discretion by denying her motion); *see also In re B.M.*, No. 13-17-00467-CV, 2017 WL 5953098, at *10 (Tex. App.—Corpus Christi–Edinburg Nov. 30, 2017, pet. denied) (mem. op.) (holding

---

[10] In July 2019, Mother was instructed to attend domestic violence counseling, and Father was asked to complete a mental health evaluation through MH-MR. Mother initiated her services on October 2019, one week before the termination hearing. Father completed the MH-MR assessment, but he did not return for recommended services. Morales stated Father's actions were deliberate, and he had expressed to her that he did not intend on "follow[ing] through any further than completing the assessment." At an unspecified "recent" point prior to the termination hearing, Father scheduled a follow-up appointment with MH-MR for the day after the hearing.

10

that "lack of communication with the Department case worker" is not evidence of "extraordinary circumstances" to justify an extension of her case).

Thus, we hold that the trial court did not abuse its discretion by denying Father and Mother's motion to extend the dismissal deadline. We overrule Father and Mother's first issue.

## III.  SUFFICIENCY OF THE EVIDENCE

Father and Mother next contend that the evidence is legally and factually insufficient to support a predicate finding under either subsection (D) or (E) of family code § 161.001(b)(1). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E).

### A.  Standard of Review and Applicable Law

"Termination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases." *In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring). Accordingly, termination proceedings must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d at 112; *see In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018); *but see In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) ("[T]he rights of natural parents are not absolute; protection of the child is paramount . . . . The rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994))).

To terminate parental rights, the movant must prove by clear and convincing evidence that (1) the parent committed one or more statutory predicate acts or omissions, and (2) termination is in the child's best interest. *See* TEX. FAM. CODE ANN. §§ 101.007, 161.001(b); *see also In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019) (per curiam). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the

11

mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007. "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *In re A.C.*, 560 S.W.3d at 630.

"Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the [fact finder] and considering undisputed contrary evidence, a reasonable [fact finder] could form a firm belief or conviction that the finding was true." *Id.* (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We must also consider undisputed evidence, if any, that does not support the finding. *In re K.M.L.*, 443 S.W.3d at 113; *see In re J.F.C.*, 96 S.W.3d at 266 ("Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.").

In conducting a factual sufficiency review, we consider whether the disputed evidence is such that a reasonable finder of fact could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. Evidence is factually sufficient if "the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the [Department]'s allegations." *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).

## B.    Termination Under § 161.001(b)(1)(D) and (E)

While both subsections (D) and (E) focus on endangerment, they differ regarding the source and proof of endangerment. *See In re M.M.*, 584 S.W.3d 885, 889 (Tex. App.—Amarillo 2019, pet. denied). Subsection (D) requires a showing that each parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN.

12

§ 161.001(b)(1)(D). Endanger "means to expose to loss or injury, to jeopardize." *In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (citing *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam)). "Knowingly" requires that "the parent be aware of but disregard" the potentially endangering environment at issue. *See In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.). It is not necessary, however, that the Department show the child's environment directly threatened or injured the child. *See In re M.M.*, 584 S.W.3d at 889. Further, termination under subsection (D) is permitted on the basis of a single act or omission. *See id.* at 889–90; *In re E.M.*, 494 S.W.3d 209, 221–22 (Tex. App.—Waco 2015, pet. denied).

Under subsection (E), the relevant inquiry is whether evidence exists that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E). Unlike subsection (D), a finding under subsection (E) cannot be based on a single act or omission. *See In re P.W.*, 579 S.W.3d 713, 726 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Subsection (E) "requires a voluntary, deliberate, and conscious course of conduct by the parent." *Id.* Like subsection (D), however, it is not necessary that the parent's conduct be directed at the child or that the child actually suffer injury. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *P.W.*, 579 S.W.3d at 726. A fact finder is also not limited to consideration of the parent's actions before the child has been removed by the Department; any actions or inactions occurring before and after a child was born may be considered, including evidence of a parent's drug use or proclivity for violence. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009).

Evidence of the children's environment before the Department obtained custody, including the acceptability of the children's living conditions and parental conduct in the home, is subsumed in the (D) and (E) endangerment analysis. *See In re J.E.M.M.*, 532 S.W.3d 874, 880–81 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Likewise, "[i]nappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in the home is a part of the 'conditions or surroundings' of the child's home" under subsection (D) and (E). *In re M.D.M.*, 579 S.W.3d 744, 764 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (quoting *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)); *see also In re E.M.*, 494 S.W.3d at 222 ("Abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child.").

Father and Mother generally contend that no evidence was introduced to demonstrate that they had ever endangered or neglected their children, or that their behavior was likely to ever endanger or neglect the children. The Department counters that the trailer's unlivable conditions, A.B.'s outcries of witnessing domestic violence, the parent's substance abuse history, Father's untreated mental illnesses, and the parent's service initiation delays are all sufficient evidence to support the trial court's finding of endangerment.

The record contains evidence that the children were living in an unsafe, unstable home environment prior to their removal from Father and Mother's care. The children's residence was (1) without adequate access to running water; (2) dirty and smelled of feces, urine, and cigarette smoke; (3) lacked insulation from the outdoors due to a hole

14

in the wall from where the air conditioning unit had fallen in; and (4) did not provide for safe sleeping arrangements as two children slept under a collapsing roof while their nine-month-old sibling slept several feet away on the floor. *See In re A.L.*, 545 S.W.3d 138, 146 (Tex. App.—El Paso 2017, no pet.) (providing that evidence of extremely unsanitary conditions, such as pet feces and urine found throughout the home, insects seen on dirty dishes, and unflushed toilets, supported finding of endangerment); *Phillips v. Tex. Dep't of Protective & Reg. Servs.*, 25 S.W.3d 348, 352, 354–55 (Tex. App.—Austin 2000, no pet.) (finding sufficient evidence of endangerment where home was "filthy," contained rodents, and had clothes and trash everywhere); *see also In re M.B.*, No. 13-19-00411-CV, 2019 WL 5997509, at *5 (Tex. App.—Corpus Christi–Edinburg Nov. 14, 2019, no pet. h.) (mem. op.) (finding endangerment due to lack of electricity or running water in the trailer); *In re E.C.S.*, No. 14-19-00039-CV, 2019 WL 2589943, at *14 (Tex. App.—Houston [14th Dist.] June 25, 2019, no pet.) (mem. op.) (affirming endangerment finding where home was "unsanitary, contained exposed wiring, had no running water, and had an odor attributable to dog feces and urine found throughout the home").

Evidence of violent conduct in the home between parents is also evidence of an environment that endangers the physical or emotional well-being of a child. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). According to Yackle, A.B. witnessed physical violence in the home. *See In re P.W.*, 579 S.W.3d at 727; *In re S.R.*, 452 S.W.3d 351, 361 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) ("Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment.") (citations omitted). Yackle's depictions of physical violence between Father and Mother were consistent with suspicions raised by the

Department caseworker and Father's counselor, who testified to witnessing extensive verbal abuse. Despite reports of Father's volatility or aggression towards Mother, Mother never removed herself or her children from the situation, denies she has ever been subjected to domestic violence, and relies wholly on Father to parent their children. *See In re I.G.*, 383 S.W.3d 763, 770 (Tex. App.—Amarillo 2012, no pet.) ("A parent's failure to remove himself and his children from a violent relationship endangers the physical or emotional well-being of the children."); *cf. In re M.G.P.*, No. 02-11-00038-CV, 2011 WL 6415168, at *11 (Tex. App.—Fort Worth Dec. 22, 2011, pet. denied) (mem. op.) (finding endangerment evidence insufficient where Mother, following recurrent issues of domestic violence, sought shelter for herself and her children and there was no evidence that at the time of trial, she was still living with Father or in an ongoing relationship with him).

Evidence of narcotics use and its effect on a parent's life and his or her ability to parent may also establish that the parent has engaged in an "endangering course of conduct." *See In re B.M.S.*, 581 S.W.3d 911, 917 (Tex. App.—El Paso 2019, no pet.); *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). The evidence concerning the parents' substance abuse here reflected "more than just 'remote and isolated incidents'" and indicated Mother and Father's improper prioritizations. Despite the family's dire financial state and Father and Mother's obligation to provide a safe, livable environment for their children, Father and Mother instead used money to purchase marijuana and cocaine. *See In re D.M.*, 58 S.W.3d 801, 813 (Tex. App.—Fort Worth 2001, no pet.) (considering a parent's choice to spend money on drugs despite other financial obligations). One month before the children were removed, the Department had just closed out its prior case involving Father and Mother—a case opened only after K.B. was

16

born testing positive for marijuana. At the time of removal, Father and Mother tested positive for marijuana, and Mother confessed to using marijuana daily. Additionally, Father and Mother were unable to hide their drug use from their children. A.B., although only eight years old, was privy to her parents' drug use and articulated to Yackle what the drugs looked like, where her parents kept their drugs, and how they would hide the drugs when "C.P.S. came." *See In re B.M.S.*, 581 S.W.3d at 917; *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App—Houston [1st Dist.] 2009, pet. denied) (reasoning that a parent's illegal drug use may support termination under subsection (E) because "it exposes the child to the possibility that the parent may be impaired or imprisoned"). Moreover, drug use persisted after the children were removed from the home. *See In re S.R.*, 452 S.W.3d at 361–62 ("Continued illegal drug use after a [child is] remov[ed] is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct.").

The Department provided evidence that Father and Mother's drug use exacerbated their mental illnesses, which went largely untreated due to noncooperation. *See In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (providing that untreated mental illness may also expose a child to endangerment). Though Father and Mother began counseling prior to the Department's removal of their children, Morales testified that Father and Mother only attended "five or six sessions" and then "kind of disappeared." Father returned to counseling in July 2019, and he continued to refuse to take medication and was unwilling to learn any skills to manage his volatility, said Morales. As a consequence, Morales stated her sessions with Father have been fruitless. *See In re P.H.*, 544 S.W.3d 850, 858 (Tex. App.—El Paso 2017, no pet.)

(considering a parent's refusal to treat their mental health as a factor in the endangerment analysis); *In re S.R.*, 452 S.W.3d at 363. Although Mother did not testify and her mental health issues were not as debilitating as Father's, Mother was present during many of the counseling sessions with Father. The trial court could have inferred that Mother knew Father had serious untreated mental health issues that put their children at risk and nonetheless, she did not seek to remove her children from the environment. *See In re A.C.*, 560 S.W.3d at 632 (allowing inferences arising from evidence to support the trial court's finding). Finally, Morales testified to the effects that witnessing unstable parents can have on a child's emotional well-being, stating that several months prior to the children's removal, G.B., a first grader, was expelled from school after threatening to take a gun to school to "kill everybody."

The Department also presented evidence to support a finding that Father and Mother's delay in their initiation of court ordered services was deliberate and indicative of their lack of protective capabilities towards their children. *See In re S.R.*, 452 S.W.3d at 362 ("A parent's efforts to improve or enhance parenting skills are relevant in determining whether a parent's conduct results in endangerment under subsection E." (citing *In re D.T.*, 34 S.W.3d 625, 640 (Tex. App.—Fort Worth 2000, pet. denied)). At the time of Father's belligerent outburst in April 2019, the children had been in their foster placement for six months, yet: (1) Father and Mother had not begun attending counseling; (2) Father and Mother had begun attending substance abuse counselling sessions at their home two months prior but had already discontinued services; (3) Father and Mother were still testing positive for drugs; (4) Father and Mother continued to deny domestic violence in

18

the home despite contrary reports; and (5) Father and Mother had not remedied any of the residence's safety hazards. *See In re J.O.A.*, 283 S.W.3d at 345.

Though the parents completed many of the services and requirements in the weeks leading up to the termination hearing, the trial court was privy to evidence of serious unresolved issues affecting Father and Mother's ability to create and maintain a safe environment for their children. Such issues were contested at trial—namely, Father and Mother continued to deny domestic violence in the home and disputed the degree of Father's mental health advancements. *See In re N.H.N.*, 580 S.W.3d 440, 446 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (according due deference to the trial court's credibility determinations); *see also In re R.S.-T.*, 522 S.W.3d 92, 109–10 (Tex. App.— San Antonio 2017, no pet.) ("Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment.").

We observe that the evidence in this case does not show that these children suffered any physical injury due to Father and Mother's conduct or neglect.[11] However, such a showing is not necessary to support endangerment findings. *In re M.J.M.L.*, 31 S.W.3d 347, 350 (Tex. App.—San Antonio 2000, pet. denied) ("[E]ndangerment must be a direct result of a parental course of conduct, the conduct described does not have to be specifically directed at the child; nor does it have to cause an actual injury to the child or even constitute a concrete threat of injury to the child.").

---

[11] We note, however, that Father and Mother's treatment of S.B. after believing her to have sustained a broken arm was indicative of their propensity for medical neglect. Despite conceding they believed her condition warranted medical intervention, they failed to timely seek appropriate medical care for their child. *See In re J.D.G.*, 570 S.W.3d 839, 852 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

19

From the foregoing evidence, a rational finder of fact could have formed a firm belief or conviction that both appellants knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). Moreover, to the extent the facts were disputed, the trial court could have reasonably resolved those disputes in favor of the challenged finding. *See In re J.J.L.*, 578 S.W.3d 601, 609 (Tex. App.—Houston [14th Dist.] 2019, no pet.) ("We may not second-guess the fact finder's resolution of actual dispute by relying on disputed evidence or evidence the fact finder 'could easily have rejected as not credible.'" (quoting *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003))). Accordingly, we conclude that the evidence was legally and factually sufficient to support termination under subsection (D) and (E). *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E).

## C.    Best Interest of the Children

Father and Mother also challenge the legal and factual sufficiency of the evidence to support the trial court's finding that termination of their parental rights is in the best interest of the children. *See id.* § 161.001(b)(2).

As previously established, in addition to a predicate violation, the Department must prove by clear and convincing evidence that termination is in the children's best interest. *See id.*; *see also id.* § 153.002 ("The best interest of the child shall always be the primary consideration of the court in determining the issues of conservatorship and possession of and access to the child."). There is a strong presumption that the best interest of the children is served by keeping the children with their natural parents. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam) (citing TEX. FAM. CODE ANN. § 153.131(b)).

A fact finder may consider a number of factors to determine the child's best interest, including the child's desires, the child's present and future physical and emotional needs, the present and future emotional and physical danger to the child, the parental abilities of the people seeking custody, programs available to assist those people in promoting the child's best interest, plans for the child by those people or by the agency seeking custody, the acts or omissions of the parent that may indicate that the existing parent-child relationship is not appropriate, and any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re E.N.C.*, 384 S.W.3d 796, 807–08 (Tex. 2012) (reciting the *Holley* factors). Our "best interest" analysis is not limited to these *Holley* factors, and the absence of evidence regarding some of the factors does not preclude a fact finder from reasonably forming a strong conviction or belief that termination is in the child's best interest. *See In re C.H.*, 89 S.W.3d at 27.

### 1.    Children's Desires

As to the first *Holley* factor, Moretish informed the court of the eldest daughter's wishes to remain living with her siblings in foster care. *See Holley*, 544 S.W.2d at 371–72. Moretish and Yackle testified to the bond that has been established in the last eleven months between the children and their foster family.

### 2.    Children's Emotional and Physical Needs Now and in the Future; Available Programs; and the Parenting Abilities of the Parents

The record here is replete with evidence indicating that Father and Mother were unable to meet their children's needs, lacked parenting abilities, and failed to make use of available programs at the outset when they exposed their children to unsuitable living

21

conditions, drug use, and domestic violence.[12] *See Holley*, 544 S.W.2d at 371–72; *see also D.O. v. Tex. Dep't of Human Servs.*, 851 S.W.2d 351, 356 (Tex. App.—Austin 1993, no writ) (providing that factfinder may infer that a parent's past inability to meet a child's physical and emotional needs at the time the child was in the parent's custody may be indicative of the parent's future inability to meet the child's physical and emotional needs if the child is returned to the parent); *Garza v. Tex. Dep't of Human Servs.*, 794 S.W.2d 521, 525 (Tex. App.—Corpus Christi–Edinburg 1990, no writ) (holding that a parent's lack of judgment and parenting skills are factors to consider in a parental termination analysis).

The Department contends that severe problems persist, affecting the parents' ability to meet their children's needs now and in the future because any adherence to the Department's requirements for program participation is too superficial to effectuate any real change. *See Holley*, 544 S.W.2d at 371–72; *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (considering a parent's willingness to effect positive changes to improve their situation for the benefit of their children); *see also In re J.L.C.*, 582 S.W.3d 421, 432–33 (Tex. App.—Amarillo 2018, pet. ref'd) (noting that a parent's delay in beginning services is a consideration in the best interest determination). Father and Mother were required, in part, to participate in therapy and substance abuse classes. Though Father and Mother returned to therapy three months before the termination hearing, their counselor opined that they remained uncooperative, no advancements had occurred to treat either parent's mental health problems, and the

---

[12] Moreover, Father and Mother's inability to meet their children's needs extends far beyond the Department's second 2018 case. Four years prior, the parents voluntarily and informally relinquished their rights to their third child because they were homeless, struggling with substance abuse, and already having difficulty raising A.B. and G.B. One year later, L.B. was born, followed by S.B. and K.B.

parents continue to deny domestic violence in the home in the face of divergent evidence. *See Holley*, 544 S.W.2d at 371–72; *In re O.N.H.*, 401 S.W.3d 681, 684–85 (Tex. App.—San Antonio 2013, no pet.) (stating that simply exposing a child to the other parent's violence is a relevant consideration in determining a child's best interest); *see also In re R.J.*, 579 S.W.3d 97, 118 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("While mental illness is not a ground for parental termination, the impact of a parent's mental illness on his ability to parent and the stability of the home are relevant factors in the best interest of the child analysis."). Similarly, though Father and Mother began substance abuse counseling in February, they continued to test positive for drugs throughout the pendency of this case; only Father tested negative for drugs for more than a two-month period. There has been no evidence presented that either parent has learned how to cope with their mental health, substance abuse, or Father's violent propensities. *See In re J.H.G.*, 313 S.W.3d 894, 899 (Tex. App.—Dallas 2010, no pet.) (providing that where a parent attended services, but "did not take full advantage of them nor show that she would use them to care for [her child]," this factor weighs in favor of termination).

### 3. Plans for the Children; Stability of Home or Proposed Placement

The stability of the children's proposed home environment is a significant consideration in determining whether termination of parental rights is in their best interest. *In re J.G.S.*, 574 S.W.3d 101, 126 (Tex. App.—Houston [1st Dist.] 2019, no pet.); *In re J.D.*, 436 S.W.3d 105, 120 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("Stability and permanence are paramount in the upbringing of children."). According to Moretish, the children are doing exceedingly well in their current placement, meeting their developmental milestones and, with the exception of G.B., they are excelling in school.

The Department also presented evidence that the foster family is open to adoption. *See Holley*, 544 S.W.2d at 371–72; *In re W.E.C.*, 110 S.W.3d 231, 245 (Tex. App.—Fort Worth 2003, no pet.).

Conversely, the trial court reasonably could have determined that Father and Mother's stability remains just as precarious as it has always been. Father's articulated plans for stability—which included possibly securing contracted employment with local law enforcement, inheriting a larger trailer conditioned on the landlord "kicking people out of" it first, and promising to continue therapy in addition to taking his required medication— were, as Father acquiesced, "not guaranteed" or unlikely to come to fruition based on Father and Mother's prior inability to prioritize their children's needs, as discussed at length above. *See Holley*, 544 S.W.2d at 371–72; *In re N.J.H.*, 575 S.W.3d at 832 ("[E]vidence of improved conduct, especially of short[]duration, does not conclusively negate the probative value of a long history of . . . irresponsible choices." (quoting *In re J.O.A.*, 283 S.W.3d at 346)); *In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) ("Evidence of a parent's unstable lifestyle can . . . support a factfinder's conclusion that termination is in the child's best interest.").

### 4. Remaining Factors

Based on witness depictions of the visitations and interactions between the parents and their children, Father and Mother's acts and omissions, at minimum, continue to suggest an undervalued parent-child relationship. *See Holley*, 544 S.W.2d at 371–72; *In re J.H.G.*, 313 S.W.3d at 900 (where a parent engaged very little with her child, had a "flat affect and did not seem excited to see [her child] when she arrived for her visits and showed no emotion when she left," the parent's acts and omissions weighed in favor of

24

termination); *see also In re D.W.*, 445 S.W.3d 913, 932 (Tex. App.—Dallas 2014, pet. denied) (providing that evidence considered in other *Holley* factors may be relevant in analyzing the final two factors).

We observe that Father and Mother have taken several steps to improve their lives so that they may be equipped to better provide for themselves and by extension, their children—including becoming sober and attending therapy. However, Father and Mother have found sobriety and attended therapy in the past, only to relapse shortly thereafter to the detriment and neglect of their six children.[13] While it is "our obligation to strictly scrutinize termination proceedings and strictly construe the statute in favor of the parent," *In re L.J.N.*, 329 S.W.3d 667, 673 (Tex. App.—Corpus Christi–Edinburg 2010, no pet.), we remain mindful that the critical inquiry remains what is in the best interest of the child, not what is in the parent's best interest. *In re C.L.C.*, 119 S.W.3d 382, 399 (Tex. App.—Tyler 2003, no pet.).

Having analyzed the evidence under the applicable law and appropriate standards of review, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that termination of both appellants' parental rights was in the best interest of A.B., G.B., L.B., S.B., and K.B. *See Holley*, 544 S.W.2d at 371–72; *In re J.O.A.*, 283 S.W.3d at 346; *cf. In re J.E.M.M.*, 532 S.W.3d at 891 (holding that the "record evidence falls short of the requisite legal standard and cannot support termination of [a parent's]

---

[13] The trial court noted as much in an explanation of its findings:

The incompletion of services[,] particular[ly] pertaining to drug use, counseling[,] and mental health and anger management is disturbing, particularly in light of the fact they had already been through services once to some degree, and yet when it came to this time it was—well, just wasn't pursued in a manner that left one feeling that it was going to get done, and in fact it didn't get done. . . .

25

parental rights" where the parent failed to complete the Department's services but the parent "has no prior history with the Department, no history of drug abuse or committing family violence, no criminal history, . . . [and] no mental-health diagnosis" and there was "no legally sufficient evidence of endangerment or abandonment"). We overrule Father and Mother's last issue on appeal.

## IV. CONCLUSION

We affirm the trial court's judgment.

GREGORY T. PERKES
Justice

Delivered and filed the
27th day of February, 2020.

26