

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00422-CV

_____

IN THE INTEREST OF A.S. AND A.M., CHILDREN

On Appeal from the 323rd District Court
Tarrant County, Texas
Trial Court No. 323-107789-18

Before Sudderth, C.J.; Gabriel and Kerr, JJ.
Memorandum Opinion by Justice Gabriel

## MEMORANDUM OPINION

Appellant L.M. (Father) appeals from the trial court's order terminating his parental rights to his daughter A.M. (Mary).[1]  Father argues that the evidence was insufficient to support the three conduct grounds found by the trial court and to support the trial court's best-interest finding.  We conclude that the evidence, which included Father's extensive criminal history, sufficiently supported the trial court's termination order.  Accordingly, we affirm.

## I.  BACKGROUND

M.C. (Mother) had three children: A.J. (Jill), A.S. (Susan), and Mary.  Susan was born in 2008 and her father is L.S. (Sam).  Mary was born in 2010.  Jill was born in 2013 to Mother and E.J. (John).

Beginning in 2008, the Department of Family and Protective Services (DFPS) initiated seven investigations into Mother's, Father's, Sam's, and John's conduct regarding the children.  In short, the three children were repeatedly exposed to "instability, drug use[,] and domestic violence," leading to the investigations.

It is unclear when Mother's relationship with Father began, but it is relevant that Father was convicted in 2008 of the theft of property valued at between $1,500

---

[1]We use aliases to refer to the affected children and their relatives.  *See* Tex. R. App. P. 9.8(b).

and $20,000 and of possession of a prohibited weapon.[2] Mary tested positive for marijuana and opiates at her birth in 2010. Two months before Mary's birth, Father had been arrested for and later convicted of possession of between four ounces and five pounds of marijuana.[3] Four months after Mary's birth, Father was arrested for aggravated assault with a deadly weapon against Mother, Susan, and Mary. The indictments alleged that (1) Father hit Mother with his hand, choked her, threatened her with imminent bodily injury, and exhibited a firearm; (2) restrained and restricted Mary's movements by force, intimidation, or deception while using or exhibiting a firearm; and (3) restrained and restricted Susan's movements by force, intimidation, or deception while using or exhibiting a firearm. Under a plea-bargain agreement with the State, Father pleaded guilty to one count of aggravated assault with a deadly weapon against Mother and was sentenced to ten years' confinement on August 29, 2011.[4]

Arising from this same domestic-violence conviction, Father was charged with possession of between 4 and 200 grams of methamphetamine, unlawful possession of

---

[2]The prohibited weapon was a shotgun with a barrel length of less than eighteen inches. *See* Tex. Penal Code Ann. §§ 46.01(10), 46.05(a)(1)(C).

[3]Father pleaded guilty and was later sentenced to six months' confinement.

[4]Although Father pleaded guilty, he and Mother later denied that Father had pointed a gun at Mother during the assault.

3

a firearm based on his 2008 felony-theft conviction, and forgery.[5] For each of these offenses, Father pleaded guilty under a plea-bargain agreement and was sentenced to concurrent ten-year sentences. Mother brought Mary to jail once to visit Father; Father's mother brought Mary "several times."

Mother, her uncle J.C. (Uncle), her boyfriend M.J. (Boyfriend), and her three children began living at Boyfriend's home. Mother referred to Boyfriend as her "sugar daddy"[6] and recognized that he was not a good influence. Sam was "in and out" of the home approximately two to three times every week but would help care for Susan only "when he felt like it." Mother knew that Sam also was not a good influence. Indeed, Sam was convicted of possession of methamphetamine and of heroin in 2019.

On May 30, 2018, Mother was at the hospital with Susan, who had appendicitis. The hospital contacted DFPS because Mother was acting erratically and appeared to be using some sort of illegal drug:

> [Mother] arrived late for the [May 30, 2018] surgery and when she arrived, she was swaying, stumbling and unsteady on her feet. It was reported that [Mother's] speech was slurred and [her] eyes were "glassy." The report states that [Mother] repeatedly went to the bathroom [in Susan's room] staying 25 minutes at a time and [Boyfriend] reported that she had cut herself while wiping, which is why she was in the bathroom. [Mother] left the hospital and returned at 2am. At 3 am, medical staff

---

[5]Father possessed, with the intent to pass, a counterfeit fifty dollar bill.

[6]Mother explained that this term meant she agreed to be his girlfriend and he "would help me pay for everything."

4

> heard [Mother] screaming in the child's bathroom. She was found sitting on the toilet; on the ground was a mini torch and a rag. On 5/31/18, [Mother] was asleep sitting up in a chair; she could not open her eyes and kept falling asleep and was not able to be woken up. Medical staff found a plastic broken jar with a mirror on the bottom that had white residue on it in the child's bathroom.

It was also reported to DFPS at that time that Mother "has bipolar and schizophrenia" but would not take medication for it. Mother later admitted that she does not take her schizophrenia medication regularly.

A DFPS investigator, Jessica Eastman, discovered that Boyfriend's apartment was covered in dog feces and vomit, that there were prescription drugs easily accessible to the children, and that the kitchen was unsanitary. Mother repeatedly delayed getting a drug test at DFPS's request and when she finally complied, she tested positive for heroin. In fact, Mother's drug use led to her convictions for possession of methamphetamine, heroin, and oxycodone.[7] Uncle and Boyfriend tested positive for methamphetamine. Sam tested positive for marijuana. Mary and Jill also tested positive for methamphetamine; Susan did not. Eastman found reason to believe that Mother provided neglectful supervision and physical care to the three children and that Mother was physically abusive to Mary and Jill. She also found reason to believe that Sam provided neglectful supervision and physical care to Susan.

In July 2018, DFPS asked for an emergency removal of the children, which the trial court ordered, and filed a petition for conservatorship and for termination of

---

[7]Mother was incarcerated at the time of trial.

Mother's, Sam's, and Father's parental rights.[8] At that point, the case regarding the children was transferred to DFPS caseworker April Vaughan. Eventually, Susan and Mary were placed in foster care in Houston with Dana Thomas, whose son had previously dated Mother.[9] Mother stated that she considers Thomas to be her mother. Vaughn prepared service plans for Mother, Father, and Sam. Mother and Sam did not complete any services and continued their drug use. Vaughn mailed Father's service plan to him in prison, but Father did not have services available. His service plan included actions he must perform upon his release from prison, which he expected to occur in February 2020.[10] Father informed Vaughn that his brother M.M. (Mike) would be an appropriate placement for Mary. Mike was ruled out as a placement because he had twice been charged with assault of a family member and once for possession of marijuana. Mike recommended no other family placements for Mary.[11]

---

[8]Mother initially would not identify Mary's father, but DFPS identified Father "[b]y looking through the prior [DFPS] history and through the register." Eastman was informed that Father was in jail.

[9]John was granted permanent managing conservatorship of Jill in January 2019. The portion of the case regarding Jill was severed into a new cause number, and she and John are not parties to this appeal.

[10]Because some of Father's convictions involved a deadly weapon, his release date is probably later.

[11]There was some indication at trial that other family members of Father's offered to take Mary, but Vaughn had no knowledge that this had happened.

At the termination trial, Father testified that he would do "anything" for Mary but admitted he has had little to no relationship with her. In fact, Father had twelve opportunities to visit Mary during the time between her removal and Father's imprisonment, but he participated in only three. While incarcerated, Father had completed a prerelease program that included a drug-education component. He knew that Mary and Susan were very bonded and had been together at Thomas's home, but he believed it would be "easier" for both "to be right here in Fort Worth" where Father owned a home. He contended that either Mike or his sister S.M. (Stacy) would be a good placement for both girls until he and Mother could "get it together." Although Stacy is a Marine, Father did not know what would happen to Mary if Stacy were deployed. Father believed Mike would be willing to take both girls because "that would be the right thing to do for the parents to raise the kids"; but Mike testified that he could only take Mary and could adopt her in the future if Father could not care for her. Thomas had allowed Mike to see Mary, and she testified that she would continue to do so. Thomas was also willing to let Mother and Father see Mary and Susan. Thomas's goal was to adopt Mary and Susan.

Thomas testified that it would be in Mary's and Susan's best interest for Mother's, Father's, and Sam's parental rights to be terminated because Mary and Susan need to be together and because she has been a constant in Mother's and the children's lives. Both Mary and Susan have improved since they have been in Thomas's care. Mary and Susan's attorney ad litem stated that it would not be in their

7

best interest to move out of Thomas's home and that termination would best serve their interest in stability. The court-appointed special advocate for the children agreed that Father's parental rights should be terminated.

The trial court terminated Mother's, Father's, and Sam's parental rights to Mary and Susan.[12] The trial court found that Father had violated three conduct grounds alleged by the State in its petition: the two endangerment grounds—Section 161.001(b)(1)(D) and (E)—and the criminal-conduct ground—Section 161.001(b)(1)(Q). Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (Q). The trial court also found that termination of Father's parental rights was in Mary's best interest. *Id.* § 161.001(b)(2). Finally, the trial court appointed DFPS as Mary's permanent managing conservator. Father appeals and argues that the evidence was insufficient to support any of the conduct grounds or that termination was in Mary's best interest.

## II. CONDUCT GROUND

### A. SUFFICIENCY STANDARDS AND SCOPES OF REVIEW

In his first issue, Father asserts that the evidence was legally and factually insufficient to support any of the found conduct grounds supporting termination.[13]

---

[12]Neither Mother nor Sam appealed the termination of their rights to Susan; thus, that portion of the termination order is not at issue in this appeal. Mother does not appeal the termination of her parental rights to Mary.

[13]Although Father recites the legal-sufficiency standard, his substantive briefing is cast only in terms of factual sufficiency. But because legal sufficiency is fairly presented, we will address it. *See* Tex. R. App. P. 38.9; *Horton v. Stovall*, 591 S.W.3d 567, 569–70 (Tex. 2019) (per curiam).

Although the parent–child relationship is to be protected, it may be terminated upon a showing by clear and convincing evidence that the parent's actions satisfy a statutory ground justifying termination and that termination would be in the child's best interest. *Id.* §§ 161.001(b), 161.206; *In re E.R.*, 385 S.W.3d 552, 554–55 (Tex. 2012). Evidence is clear and convincing if it "produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007.

In evaluating the evidence for legal sufficiency in parental-termination cases, we determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the challenged ground for termination was proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam). We review all the evidence in the light most favorable to the finding and judgment and resolve any disputed facts in favor of the finding if a reasonable fact-finder could have done so. *Id.*

When the factual sufficiency of the evidence is challenged, we again review the entire record in the light most favorable to the finding, giving due deference to the fact-finder's findings, and may not supplant the judgment with our own. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). We are to weigh the disputed evidence against the evidence supporting the challenged finding. *See In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). Evidence is factually insufficient if the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that the fact-finder could not reasonably have formed a firm belief or conviction that the

9

parent violated a conduct provision of Section 161.001(b)(1) or that the termination of the parent–child relationship would be in the children's best interest. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).

Clear and convincing evidence of one pleaded conduct ground is sufficient to support a termination decision if coupled with sufficient best-interest evidence. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re D.M.*, 58 S.W.3d 801, 813 (Tex. App.—Fort Worth 2001, no pet.). But if one of the pleaded and found conduct grounds is based on endangerment—Section 161.001(b)(1)(D) or (E)—we are required to fully address that ground, if presented on appeal, based on the future collateral consequences of such a finding. *See In re N.G.*, 577 S.W.3d 230, 234–37 (Tex. 2019) (per curiam); *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(M) (allowing termination of parent's parental rights if such rights to another child had been terminated under Section 161.001(b)(1)(D) or (E)).

## B. Application of Standard to Record Evidence

Section 161.001(b)(1)(D) allows the termination of parental rights if, before the children were removed, the parent knowingly placed or allowed the child to remain in conditions or surroundings that endangered the physical or emotional well-being of the child. Tex. Fam. Code Ann. § 161.001(b)(1)(D); *In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (op. on reh'g). This subsection requires a showing that the child's environment—the child's living conditions along with the conduct of parents or others in the home—endangered her physical or

10

emotional health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996) (per curiam); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (citing *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no writ)). Endangerment occurs when the child's environment creates a potential for danger that the parent is aware of but consciously disregards. *See S.R.*, 452 S.W.3d at 360. Any danger to a child's well-being may be implied from a parent's conduct, and conduct that subjects a child to a life of uncertainty and instability endangers that child. *Id.* Finally, evidence of criminal conduct (including drug-related conduct), convictions, imprisonment, and a propensity for violence (including domestic violence) are relevant when reviewing whether a parent had an awareness of an environment sufficient to show endangerment under Section 161.001(b)(1)(D). *In re A.M.*, No. 02-19-00023-CV, 2019 WL 3334420, at *9 (Tex. App.—Fort Worth July 25, 2019, no pet.) (mem. op.); *S.R.*, 452 S.W.3d at 360–61; *In re A.A.L.A.*, No. 14-15-00265-CV, 2015 WL 5437100, at *6 (Tex. App.—Houston [14th Dist.] Sept. 15, 2015, no pet.) (mem. op.).

We first address Father's argument that because Eastman testified that Father was a "non-offending parent," DFPS judicially admitted that Father did not violate Section 161.001(b)(1)(D). Eastman was assigned to investigate the threshold issue of whether the children's living conditions warranted their emergency removal from the home. Because Father was in prison and not living in Boyfriend's home at that time, he was not a part of this preliminary investigation. Once the children were removed

11

from the home, Vaughn shepherded the case to determine whether DFPS should seek termination or whether reunification was possible. Eastman was not involved in the determination of Father's conduct under Section 161.001(b)(1)(D). Accordingly, Eastman's testimony could not have been a judicial admission by DFPS that Father's parental rights could not be terminated because he had not "offended" Section 161.001(b)(1).

Shortly before Mary's birth in 2010, Father was arrested for possession of between four ounces and five pounds of marijuana. When Mary was born, she tested positive for marijuana and opiates. Four months later, Father pointed a gun at Mother, hit her in the face, and choked her. It was also alleged that he assaulted Mary and Susan during the same incident. Father pleaded guilty to aggravated assault with a deadly weapon against Mother and was sentenced to ten years' confinement. At the same time, Father also pleaded guilty to possession of methamphetamine, unlawful possession of a weapon, and forgery, receiving a concurrent ten-year sentence for each offense. He was in prison for these offenses at the time the children were removed from Mother's care. And Father had a prior criminal history from 2008—a conviction for theft of property valued at between $1,500 and $20,000 and a conviction for possession of a prohibited weapon.

Father suggests that too much time has passed between his criminal behavior in 2010 and the children's removal in 2018 to link Mary's endangering environment to his conduct. But Father's conduct before Mary was born and throughout her life may

be considered, including the fact that his own criminal behavior led to his absence from Mary's life and the fact that there is no evidence Father attempted to make arrangements for Mary's safety while he has been imprisoned. *See J.G. v. Tex. Dep't of Family & Protective Servs.*, No. 03-19-00447-CV, 2019 WL 6520022, at *4 (Tex. App.—Austin Dec. 4, 2019, no pet.) ("[Father] contends too much time has passed for [his past criminal actions] to be relevant. We reject this argument because the trier of fact is entitled to consider the parent's behavior throughout the lives of the children."); *A.A.L.A.*, 2015 WL 5437100, at *6 (concluding evidence was sufficient under Section 161.001(b)(1)(D) even though Father had not been with Mother for five years before children's removal and had been in jail because Father "had a long and continuing history of criminal behavior, which endangered the children, and he knew Mother was endangering the children by using drugs while they were living with her"); *In re S.H.*, No. 04-15-00054-CV, 2015 WL 3998888, at *4 (Tex. App.—San Antonio July 1, 2015, no pet.) (mem. op.) ("The evidence presented reveals, although incarcerated, [Mother] allowed [child] to remain in a home where illegal and violent conduct occurred. . . . [Mother's] repeated criminal conduct and absence from [child's] life creates an inference similar conduct will recur if [child] is returned to [Mother]."). And Father does not address whether his past criminal conduct, most directly affecting Mary, endangered her or created a dangerous environment.

We conclude that the evidence of Father's voluntary criminal behavior before and after Mary's birth, viewed in the appropriate deferential light, revealed that

Father's voluntary criminal actions subjected Mary to a life of uncertainty and instability and allowed an inference that similar conduct would recur if Mary were returned to Father; thus, legally and factually sufficient evidence supported the trial court's finding that Father violated Section 161.001(b)(1)(D). *See, e.g.*, *J.G.*, 2019 WL 6520022, at *4; *A.M.*, 2019 WL 3334420, at *9; *S.H.*, 2015 WL 3998888, at *3–4; *In re S.M.L.*, 171 S.W.3d 472, 477–79 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *see also In re S.M.*, 389 S.W.3d 483, 492 (Tex. App.—El Paso 2012, no pet.) ("Routinely subjecting a child to the probability that she will be left alone because her parent is in jail, endangers the child's physical and emotional well-being."). In short, the evidence sufficiently allowed the fact-finder to infer that Father was aware of the potential for Mary's environment to endanger her. *A.M.*, 2019 WL 3334420, at *9. We need not address the other conduct grounds found by the trial court. *See In re T.C.*, No. 02-19-00291-CV, 2019 WL 6606172, at *1 n.3 (Tex. App.—Fort Worth Dec. 5, 2019, pet. denied) (mem. op.) ("We read *N.G.* to say that an affirmance under either (D) *or* (E) suffices because under (M) an affirmance under one makes the other moot.").[14]

---

[14]Even were we to address Section 161.001(b)(1)(E), we would conclude that this same evidence was also legally and factually sufficient to show Father engaged in a course of conduct that was endangering to Mary. *See, e.g.*, *In re J.O.A.*, 283 S.W.3d 336, 345–47 (Tex. 2009); *In re H.A.S.*, No. 11-19-00254-CV, 2020 WL 373088, at *3 (Tex. App.—Eastland Jan. 23, 2020, no pet. h.) (mem. op.); *In re J.G.*, 2019 WL 6520022, at *4.

## III.  BEST INTEREST

### A.  REVIEW FACTORS

Father also challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of his parental rights was in Mary's best interest.  We review this issue under the review standards stated regarding the conduct grounds.  But in our sufficiency review of the trial court's best-interest finding, we also are to examine several factors, including but not limited to (1) Mary's age and emotional and physical needs now and in the future; (2) the results of psychiatric, psychological, or developmental evaluations of Mary, Father, or others who have access to Mary's home; (3) whether there is a history of substance abuse by Mary's family or others who have access to Mary's home; (4) the willingness and ability of Mary's family to seek out, accept, and complete counseling services; (5) the willingness and ability of Mary's family to effect positive environmental and personal changes within a reasonable period of time; (6) Father's parenting skills; (7) the availability of an adequate social support system for Mary; (8) Father's and DFPS's plans for Mary; (9) Father's acts or omissions that indicate the existing parent–child relationship is not a proper one; and (10) any excuse for Father's acts or omissions. *See* Tex. Fam. Code Ann. § 263.307(b); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

15

## B.  APPLICATION OF STANDARD TO RECORD EVIDENCE

Both Mary's special advocate and attorney ad litem averred that termination of Father's parental rights was in Mary's best interest.  Vaughn, Mother, Father, Thomas, Mike, and Father's sister R.M. (Rita) testified that Mary and Susan were very close and should not be separated from each other.  Even so, Father testified that he does not want anyone else to raise Mary but him and that it would be "easier" if he did not have to go to Houston to see her. Mike and Rita were willing to keep Mary until Father was able to parent, but neither could take Susan.  Mike had seen Mary fourteen to fifteen times between 2014 and 2019; Rita has not seen Mary since 2016.  Once Vaughn informed Mike that he was not an appropriate foster placement for Mary based on his domestic-violence history, neither Mike nor any of Father's other family members contacted her about other possible placements for Mary.

When Mary and Susan were placed with Thomas, they had emotional issues that improved once they began therapy.  They were behind in school but caught up after Thomas got them tutoring help.  Indeed, both were getting high grades in school at the time of trial.  Thomas also advocated for Mary's educational needs at her school because Mary has ADHD.  She testified that Mary was fearful of being taken from Thomas and that Mary had never expressed a desire to live with Father's family.  Thomas wants to adopt Mary and Susan and would allow Mother, Father, and Father's family to remain in contact with Mary.  Mike affirmed that Thomas was allowing contact with Mary.  Thomas is also fostering contact between Mary, Susan,

and Jill. Mother testified that she wants Mary to stay with Thomas and Susan and to not to be placed with Father or his family. DFPS's permanency plan for Mary and Susan was for Thomas to adopt both girls.

Once he is released, Father plans to move back into his house (which his father "comes and . . . goes" from), to seek employment (which ostensibly would take him away from Mary for periods of time), and to raise Mary himself:

> [B]ecause I've been incarcerated for this amount of time, the federal government gives me a loan, right? They give me a federal loan, a $5,000 loan, and I was planning on acquiring my [commercial driver's license] . . . and going from there. It's a six to eight week course, but if I need to show any type of financial stability or anything for my child or anything, I will just jump on a rig. I did that for five years. Prior to that I worked floors, derricks, I drilled for a while, morning tower. I mean, I'm good on that.
>
> . . . .
>
> . . . I'm ain't going to let no one else raise my daughter. When I get out, I'm going to get a lawyer again or I'm going to stay here hopefully if God blesses us and I keep my rights and my parental rights and everything or maybe [Mike] could get my daughter until I come home and then we could work on getting [Susan]. I mean, that's a plan. It's better than just giving up, right?

His "parenting plan" was "being there for my child . . . for the fullest . . . extent possible." He affirmed that he believed it would be in Mary's and Susan's best interest "to be moved from the only home they've known for the past year and be placed with [his] family who they haven't seen in over three years."

The attorney ad litem reported that Thomas is providing "all of the needs for [Mary and Susan] at this point, providing a safe and stable home, providing for their

emotional, physical needs, [and] providing for the need of just feeling safe in a place." There was no evidence that Father could provide the therapies, structure, and permanence Mary needs.

We conclude that the evidence was legally and factually sufficient to show, under the relevant factors, that termination of Father's parental rights was in Mary's best interest. *See, e.g.*, *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002); *J.G.*, 2019 WL 6520022, at *5; *In re J.H.G.*, 313 S.W.3d 894, 900 (Tex. App.—Dallas 2010, no pet.); *In re T.T.*, 228 S.W.3d 312, 321–24 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *In re K.A.S.*, 131 S.W.3d 215, 229 (Tex. App.—Fort Worth 2004, pet. denied).

## IV. CONCLUSION

The evidence was legally and factually sufficient to show that Father's conduct equated to conduct under Section 161.001(b)(1)(D) and to show that the termination of his parental rights was in Mary's best interest. We therefore overrule Father's issues and affirm the trial court's termination order.

/s/ Lee Gabriel

Lee Gabriel
Justice

Delivered:  March 2, 2020

18