

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00260-CV

_____

IN THE INTEREST OF D.A., D.A., C.A., S.A., AND C.A., CHILDREN

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-679153-20

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

**MEMORANDUM OPINION**

D.A. (Father)[1] and C.W. (Mother) appeal from the judgment terminating their parental rights to five of their children. Two cases seeking termination of the parental rights to D.A. (David) and D.A. (Douglas) (collectively, the boys) and C.A. (Carrie), S.A. (Sarah), and C.A. (Catherine) (collectively, the girls) were consolidated and tried together in a bench trial. Other than a hospital employee sponsoring medical records, only seven witnesses testified: Mother, two police officers, three Child Protective Services (CPS) investigators, and the last of four caseworkers. Although Father knew about the trial, he did not personally appear; he was represented by counsel.

In terminating the parental rights to the boys, the trial court found that each parent "executed before or after the suit [was] filed an unrevoked or irrevocable affidavit of relinquishment of parental rights." *See* Tex. Fam. Code Ann. § 161.001(b)(1)(K). In terminating the parental rights to the girls, the trial court found that each parent "knowingly placed or knowingly allowed the [girls] to remain in conditions or surroundings which endanger[ed] the[ir] physical or emotional well-being" (the endangering-environment findings) and "engaged in conduct or knowingly placed the [girls] with persons who engaged in conduct which endanger[ed] the [girls'] physical or emotional well-being" (the endangering-conduct findings). *See*

---

[1]We use pseudonyms for the names of the children and their families to protect the children's privacy. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b).

2

*id.* § 161.001(b)(1)(D), (E). The trial court found that terminating each parent's rights was in the children's best interest. *See id.* § 161.001(b)(2).

In two issues, Father challenges the legal and factual sufficiency of the evidence supporting the endangerment findings against him. In her sole issue, Mother challenges the factual sufficiency of the evidence supporting the best-interest finding against her regarding the girls. Because the evidence is legally and factually sufficient to support the finding that Father engaged in conduct that endangered the girls and factually sufficient to support the finding that termination of the parental relationship between Mother and the girls is in the girls' best interest, we affirm.

## I. STATEMENT OF FACTS

### A. The Removals

Late one September 2019 evening, Mother bought candy for her children and put it on top of the refrigerator instead of giving it them. The next morning, Father, who came and went from the family's home as he pleased, left the four youngest children—five-year-old Douglas, four-year-old Timothy, two-year-old Carrie, and nine-month-old Sarah[2]—awake and unsupervised while Mother was either asleep or dozing in her bedroom. Father later reported that Timothy had climbed in bed with

---

[2]David, the oldest child in this suit, had spent the night with his paternal grandmother (Grandmother). Grandmother was raising the parents' eldest child, B.A. (Bailey), to whom the parents' rights had been terminated years earlier. Bailey and Joshua, Mother's son with a different man who was raising the boy, are not part of the underlying suit or this appeal.

Mother. Mother stated that Timothy might have come in her bedroom and touched her but that she had sent him back to the living room.

When Father returned from running errands, he heard a gunshot before he entered the house. He ran in and saw that Timothy had been shot in the head. Father then told Mother what had happened. Timothy died from the wound.

The police found the semiautomatic handgun used in the shooting in the bathroom. When the police saw that the attic door was down and had red stains on it, they went in the attic, where they found another semiautomatic handgun and illegal drugs.

The Texas Department of Family and Protective Services (the Department) began an investigation. Douglas told a forensic interviewer that Timothy had climbed up on a chair to retrieve the gun from the top of the refrigerator and had accidentally shot himself with it. Douglas also mentioned that someone had shot a gun in the home on a prior occasion. Father would not talk to the CPS investigator about the guns and drugs; Mother denied any knowledge of them and denied that the children knew of a gun in the home before the shooting.

Mother agreed to place the four children with Grandmother. Mother also agreed to take urine and hair strand drug tests. After her urine tested positive for codeine and morphine and her hair strand tested positive for cocaine, opiates, and

heroin, the trial court ordered drug testing of the children. Three[3] of them tested positive for various drugs, including the metabolite for cocaine.[4]

Meanwhile, shortly after the children were all placed with Grandmother, she informed the Department that she could not continue to care for all of them, so the Department filed a petition to terminate the parents' rights to the four children. The boys continued to live with Grandmother, and Carrie and Sarah were placed together, first in a fictive-kin placement and later in a foster home.

Mother and Father's seventh child, Catherine, was born in January 2020, while the Department's case involving the boys, Carrie, and Sarah was ongoing. As a newborn, Catherine tested negative for drugs and went home with Mother, but Mother failed a drug test a few months later, testing positive for cocaine. Mother told the OCOK[5] caseworker that she believed she tested positive because she had shared a cigarette with a family member at a funeral. Two weeks after that test, Mother tested negative in another drug test. However, two days later, Catherine tested positive for cocaine, cocaine metabolite, and marijuana. Mother could not explain why. The Department intervened, filed a termination petition, removed Catherine, and placed

---

[3]Douglas's drug test was performed after the Department filed the termination petition; his results were also positive for drugs.

[4]At trial, the trial court heard evidence that a positive result for metabolite cocaine means the cocaine was ingested.

[5]OCOK (Our Community Our Kids) is a contractor that provides conservatorship services for the Department.

her not with her siblings but in an adoption-motivated foster home. Catherine's case was consolidated with her older siblings' case.

Mother and Father's eighth child, Kayla, was born in November 2021. The caseworker testified that Kayla "was born severely addicted to opiates, oxycodone, and OxyContin, and Mo[ther] was not able to produce prescriptions that would've prevented [Kayla's] removal. She spent several weeks in a [neonatal ICU] withdrawing." Kayla is the subject of a severed suit.

## B. The Parents' Relationship

Mother and Father met in juvenile detention. They reunited in 2005, two years after her release from juvenile confinement. They were neither married nor exclusive. The relationship was on and off. Mother explained to the CPS investigator before the first removal in this case that Father would come and go at will, that he made his own choices, and that she had no control over what he did. Mother "just really dismissed [Father] and any of his actions."

The trial court heard evidence of domestic violence in the relationship. In one incident in 2017, Father became angry when Mother told him to leave her motel room, so he punched her on the head,[6] pushed her into a wall, damaged a TV, and backed his Tahoe into her car. The children were not present during that encounter.

---

[6]At trial, Mother disputed the officer's testimony that she had reported that Father hit her. She agreed that Father had shoved her, broken the TV, and backed his Tahoe into her car.

Mother asked for an emergency protective order to keep Father away. At trial, Mother insisted that she was not afraid of Father and that he never tried to hurt her. She explained that he "never pushed [her] . . . in a bad way." He would just "[p]ush her out the way, like, in his way" without "mak[ing her] hurt [her]self or anything." Mother conceded that she called the police on Father on multiple occasions. She would call the police whenever he was loud to make him leave. She testified that he would get "loud for no reason."

Mother testified that she and Father were together when all their children but Bailey were born. But Mother also testified that she and Father had not "really been together" since Timothy's September 2019 funeral, which occurred months before Catherine's birth and more than two years before Kayla's birth.

### C. Drug Abuse

Mother had used and abused drugs since her childhood. In addition to the evidence discussed above, the trial court heard the following evidence relevant to her drug abuse:

- Mother began smoking marijuana at the age of 10, stopping only when she was confined for juvenile delinquency.

- Mother began using cocaine at the age of 20.

- In July 2008, at the age of 22, Mother tested positive for cocaine during her first pregnancy. Mother initially testified that she had instead tested positive for heroin and had not known she was pregnant until then. She later admitted telling hospital staff that she had stopped using cocaine after the positive drug

7

test because she learned that she could lose custody of her baby from its birth if the baby tested positive for drugs.

- Mother and the baby, Bailey, tested negative for drugs when Bailey was born in November 2008, but Bailey's meconium tested positive for cocaine metabolites and morphine.

- When Bailey was about six months old, Mother relapsed and began using cocaine and heroin. Mother testified that she did not have the baby with her when she "was on drugs or anything."

- The Department removed Bailey, and Mother engaged in services.

- Mother testified that she felt like she was doing all the classes "for nothing" and relapsed.

- Mother's (and Father's) rights to Bailey were terminated in March 2010, and the Department placed her with Grandmother. Mother testified that she agreed to the termination. However, the termination order states that the termination of Mother's rights was based on Bailey's best interest, endangerment grounds, and Mother's having been the cause of Bailey's being born addicted to drugs or alcohol.

- Mother testified that she quit heroin "[c]old turkey" after losing her parental rights to Bailey.

- But about a month after David was born in June 2011, Mother was arrested for aggravated robbery.[7] She began using heroin again after the arrest.

- Mother got "clean" for about 18 months but began using heroin again a few months after Timothy's April 2015 birth.

---

[7]At the end of 2012, Mother received eight years' deferred adjudication community supervision for aggravated robbery with a deadly weapon and bail jumping, but she testified that her community supervision had been extended and that she remained on community supervision at the termination trial because she had not paid all her fees. Mother acknowledged that since her aggravated robbery arrest, she had been in jail for these offenses and her behavior on community supervision at least 11 times, including twice for intensive drug treatment.

8

- Mother went to jail on a community supervision violation (positive hair-strand test) when Timothy was seven months old.

- Mother testified that after that six-day jail stint, she never used heroin again.

- Mother's hair tested positive for cocaine on nine separate occasions during her several years on community supervision, but her urine tested negative for cocaine.

- During her community supervision, Mother completed inpatient drug treatment twice. The first occurred during her pregnancy with Douglas; the second occurred during her pregnancy with Sarah.

- Mother denied using cocaine during her community supervision and had no clear explanation for the positive tests. She admitted that she had spent a lot of time with her brother and sister, who abused heroin and cocaine, until after Timothy's 2019 death.

- Three of the positive hair strand tests for cocaine occurred during the pendency of the CPS cases underlying this appeal.

- Mother attributed the children's positive drug tests and her positive hair-strand tests that occurred around the time of the removal of the boys, Carrie, and Sarah to her mother (Grammie).

- Grammie was a chronic abuser of cocaine and heroin who had lived with Mother and the children and who had supervised the children.

- Grammie admitted to CPS that she watched the children while under the influence of drugs.

- The CPS investigator testified that the parents had indicated that they knew Grammie was under the influence of drugs when they let her watch the children.

- Mother testified that she no longer spent time with Grammie or her brother because they refused to stop using drugs.

- In December 2021, long after completing outpatient drug and alcohol services as part of her community-supervision requirements, and less than two months before this trial began, Mother's hair-strand test came back positive for cocaine, cocaine metabolite, and oxycodone.

The trial court heard very little direct evidence of Father's drug usage. Soon after Timothy's death, Father admitted to the CPS investigator that he smoked marijuana daily to help cope with the hallucinations and nightmares he suffered afterward. Father agreed to submit to voluntary drug testing before the removal of the boys, Carrie, and Sarah, but he never did so. He also never complied with the court-ordered drug-assessment and testing requirements.

## D. Post-Removal Efforts to Regain Custody

Father took virtually no steps to regain custody of the children. He appeared in the initial case, filing a waiver of service in October 2019. That waiver states, "I understand that I have a duty to notify the attorney for Petitioner [(the Department)] and the Court if I change my address during this proceeding." He also filed an answer that month and signed a temporary visitation schedule. But he did not contact the Department or begin services until more than a year later, after Catherine's removal, and the Department initiated the contact not Father. When Mother tested positive for cocaine in June 2020, the CPS investigator in Catherine's case tried to find Father with no success. Mother told her that she had last seen him when Catherine was born in January 2020. Grandmother told the investigator that she had last seen Father in May 2020.

The caseworker finally contacted Father in late November 2020 or early December 2020 after getting his telephone number from Mother. He told the caseworker that he was living and working in Oklahoma City. Father agreed to set up

10

visits with the children and work services. The court-ordered service plan for Father required him to complete parenting classes, a Batterer's Intervention and Prevention Program (BIPP), a drug and alcohol assessment, a psychosocial evaluation, and individual counseling; attend visitation with the children; maintain contact with the caseworker; submit to random drug testing; follow all the recommendations of any assessments; and provide proof of employment or financial resources and of stable housing.

Father completed only a couple of parenting classes before his unsuccessful discharge; he completed no other services and provided no objective proof of his employment, financial resources, or housing. Father did not attend any Department-scheduled visits with the children after the first removal in October 2019. Other than attending the births of Catherine and Kayla, there is no evidence that he had any contact with the children after the first removal.

The court-ordered service plan for Mother was much like Father's, with two differences. First, rather than a class for batterers, Mother was required to complete Safe Haven classes for domestic violence victims. Second, because she was bipolar, Mother had the additional requirements that she continue services with MHMR for any mental health needs and follow MHMR recommendations. Unlike Father, Mother completed some of the court-ordered services, like Safe Haven classes, parenting classes, and outpatient drug treatment, and she visited her children regularly, with few missed visits. But the caseworker viewed Mother's service-plan performance

as unsuccessful for several reasons, mainly because she continued to test positive for drugs and make excuses for not taking drug tests as scheduled but also because she failed to provide documentary proof, chose to withhold some health records, and did not follow MHMR recommendations.

### E. Criminal Histories

Both parents' criminal histories date back to their youth and continued after they began having children. No evidence described Father's juvenile misconduct, but he was convicted of burglary and possessing 4 or more grams of cocaine in 2006, and he was convicted of possessing under 28 grams of dihydrocodeinone[8] in 2019, just months before Timothy's death.

Mother's criminal history was extensive. In addition to evidence of the abovementioned felonies for which she remained on community supervision at the trial, the trial court received evidence of the following:

- Mother committed several assaults and was placed on juvenile probation and with a foster family by the time she was 12 or 13 years old.

- While on juvenile probation, she drove a car and wrecked, killing her friend. She was then confined in a Texas Youth Commission (TYC)[9] facility until her release at the age of 18.

---

[8]Dihydrocodeinone is also known as hydrocodone. *Smith v. State*, No. 2-08-016-CR, 2009 WL 279490, at *1 (Tex. App.—Fort Worth Feb. 5, 2009, no pet.) (per curiam) (mem. op., not designated for publication).

[9]The Texas Juvenile Justice Department has since replaced TYC. Tex. Hum. Res. Code Ann. § 201.001(b).

- In September 2008, when Mother was several months pregnant, she hit her sister, resulting in an arrest.

- In late 2014, when Douglas was not yet a year old, Mother was arrested for shoplifting and jailed.

## II. SCOPE OF APPEAL

Father implicitly limits his appeal to that portion of the judgment terminating his parental rights to the girls by challenging only the endangerment findings: the trial court did not issue endangerment findings to support the termination of Father's parental rights to the boys.[10] Mother expressly limits her appeal to that portion of the judgment terminating her parental rights to the girls. In his two issues, Father challenges the legal and factual sufficiency of the evidence to support the trial court's endangerment findings. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). He does not challenge the best-interest finding. In one issue, Mother challenges the factual sufficiency of the evidence supporting the trial court's finding that termination of her parental rights is in the girls' best interest. *See id.* § 161.001(b)(2). She does not

---

[10]Even if Father intended to appeal the termination of his parental rights to the boys, such a challenge is statutorily barred. The termination of Father's parental rights to the boys was based on clear and convincing evidence of his execution of an irrevocable affidavit of relinquishment and the boys' best interest. Tex. Fam. Code Ann. §§ 161.001(1)(K), (2), 161.103. Any appellate challenge Father could raise to that termination would be "limited to issues relating to fraud, duress, or coercion in the execution of the affidavit." *Id.* § 161.211(c); *see In re D.S.*, 602 S.W.3d 504, 518 (Tex. 2020); *In re M.M.*, 538 S.W.3d 540, 541 (Tex. 2017); *In re O.H.*, No. 02-21-00159-CV, 2021 WL 4228607, at *3 (Tex. App.—Fort Worth Sept. 16, 2021, no pet.) (mem. op.). He raises no such challenge. Thus, to the extent Father intended his appeal to contest the termination of his parental rights to the boys, "the appeal is foreclosed by statute." *M.M.*, 538 S.W.3d at 541.

challenge the endangerment findings.

### III. STANDARDS OF REVIEW

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. *Id.* § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *Z.N.*, 602 S.W.3d at 545.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. The factfinder may draw inferences, but they must be reasonable and logical. *Id.* We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.*; *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*,

14

283 S.W.3d 336, 346 (Tex. 2009). In this case, we look at all the evidence in the light most favorable to the endangerment findings against Father to determine whether a reasonable factfinder could form a firm belief or conviction that either finding is true.

In determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship, we must perform "an exacting review of the entire record." *In re A.B.* (*A.B. II*), 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved the challenged grounds. In this case, we review the entire record to resolve whether the Department proved (1) either endangerment ground against Father and (2) that termination of the parent-child relationship between Mother and the girls would be in the girls' best interests. Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (2); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

## IV. ANALYSIS

### A. Legally and Factually Sufficient Evidence of the Endangering-Conduct Finding Against Father

In his second issue, Father challenges the legal and factual sufficiency of the evidence supporting the trial court's endangering-conduct finding against him.

Because factually sufficient evidence is necessarily legally sufficient, *Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 485 (Tex. App.—Fort Worth 2004, no pet.) (op. on reh'g), we perform a consolidated sufficiency review. *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *8 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.).

The trial court found that Father "engaged in conduct or knowingly placed the [girls] with persons who engaged in conduct which endanger[ed] the [girls'] physical or emotional well-being." Tex. Fam. Code Ann. § 161.00l(b)(l)(E). "'[E]ndanger' means to expose to loss or injury" or "to jeopardize." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Under subsection (E), a parent's conduct—including acts, omissions, and failures to act—is the focus. *In re A.B.* (*A.B. I*), 412 S.W.3d 588, 650 (Tex. App.—Fort Worth 2013) (per curiam) (en banc op. on reh'g), *aff'd*, *A.B. II*, 437 S.W.3d at 507. The endangering conduct need not be directed at the child, nor must the child actually suffer injury. *J.F.-G.*, 627 S.W.3d at 312. Courts may consider a parent's conduct whether it occurs before or after a child's birth and even after the child's removal. *In re C.Y.*, No. 02-21-00261-CV, 2022 WL 500028, at *2 (Tex. App.—Fort Worth Feb. 18, 2022, pet. denied) (mem. op.); *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g); *see J.O.A.*, 283 S.W.3d at 345–47 (considering post-removal conduct). Nevertheless, "'endanger' means more than a threat of metaphysical injury or potential ill effects of a less-than-ideal family

16

environment." *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012) (quoting *Boyd*, 727 S.W.2d at 533). "Termination under subsection (E) must be based on more than a single act or omission"; "a voluntary, deliberate, and conscious course of conduct" by the parent is required. *A.B. I*, 412 S.W.3d at 599.

Generally, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *M.R.J.M.*, 280 S.W.3d at 502. "Drug use and its effect on a parent's life and his ability to parent may establish an endangering course of conduct." *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). "A parent's criminal history—taking into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists—can support a finding of endangerment." *J.F.-G.*, 627 S.W.3d at 312–13. Finally, a parent's failure to complete a court-ordered service plan may also contribute to an endangering-conduct finding. *In re S.W.*, No. 02-22-00097-CV, 2022 WL 3652489, at *4 (Tex. App.—Fort Worth Aug. 25, 2022, pet. denied) (mem. op.); *see In re M.R.*, 243 S.W.3d 807, 818 (Tex. App.—Fort Worth 2007, no pet.) (considering failure to complete service plan in endangerment analysis). For example, a factfinder may reasonably infer that a parent's failure to comply with drug-test requirements indicates drug use. *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.). A parent's failure to regularly visit with a child, a typical requirement of a service plan and a requirement of the service plans in this case, also endangers the child's well-being. *In re M.K.*, No. 02-19-00459-CV, 2020

17

WL 1949629, at *6 (Tex. App.—Fort Worth Apr. 23, 2020, no pet.) (mem. op.); *In re V.V.*, 349 S.W.3d 548, 553–54 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (en banc op. on reh'g) (considering parent's "lack of all contact with a child without any proffered excuse" in analyzing termination under subsection (E)).

The trial court heard the following endangerment evidence concerning Father:

- Father would come and go from the home as he chose.

- Father left the house on the morning of the shooting when the children were awake and Mother was in bed, either asleep or in and out of sleep.

- Father told the CPS investigator that his lawyer had advised him not to talk about the guns found in the home or the shooting.

- The CPS investigator who observed Douglas's interview believed that Father and Mother were negligent by having a loaded gun on top of the refrigerator where the children could reach it.

- Father admitted to the CPS investigator that he was smoking marijuana daily after Timothy's death to cope.

- Near the time of their removal, the boys, Carrie, and Sarah tested positive for drugs.

- Father joined Mother in allowing Grammie to watch the children even though he knew that Grammie abused cocaine and heroin and that she was under the drugs' influence while watching the kids.

- Father never took a drug test for CPS despite agreeing to do so and receiving multiple requests and a court order.

- Father knew about the court-ordered service plan at least since December 2020.

- Other than completing a couple of parenting classes, Father did not complete any services or supply proof of employment or housing beyond his unsupported statements to the caseworker that he worked and lived in Oklahoma City.

18

- Father did not attend any visits with the children after the removal.

Father correctly states that the termination of his parental rights must rest on his conduct, not Mother's. *See* Tex. Fam. Code Ann. § 161.206(a-1). On the other hand, his implication that his "absent parent" status cannot support termination because the Department did not allege actual abandonment as a termination ground is incorrect. "The grounds for termination are not mutually exclusive; rather, the same conduct may support multiple grounds and a finding that termination of a parent's rights is in the child's best interest." *J.F.-G.*, 627 S.W.3d at 314 (footnote omitted).

Father relies on the lack of evidence of a pattern of violence, the remoteness of his felony convictions, the relative inconsequentiality of his recent misdemeanor conviction and three-day sentence, and the almost complete absence of evidence of his presence in the children's lives to challenge the sufficiency of the evidence supporting the endangerment finding. Yet a criminal history and history of domestic violence are relevant to whether a person engages in an endangering course of conduct. *S.W.*, 2022 WL 3652489, at *4. Even if we do not dwell on Father's past criminality and his physical abuse of Mother, his failures to adequately supervise the children, to complete the service plan, and to visit the children after the removal sufficiently support the endangering-conduct finding.

In leaving the home on the day Timothy died, Father failed to supervise the young children and failed to ensure that Mother or a suitable substitute was supervising them. As a result, Timothy was able to retrieve the loaded gun from the

19

top of the refrigerator and shoot himself.  Even if neither parent knew a loaded gun was on top of the refrigerator, someone adequately supervising the children would have stopped the four-year-old from grabbing a chair and climbing to get something that was otherwise out of reach.  Thus, the trial court could have reasonably found that Father's leaving the children without ensuring their safety endangered them.  *See A.O.*, 2022 WL 1257384, at *10 (noting that if the mother had been paying attention, her one-year-old would not have shot himself and that her failure endangered the child).

The trial court also could have reasonably concluded that Father endangered the children by allowing Grammie to babysit them when he knew she was under the influence of cocaine and heroin.  *See S.W. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-22-00239-CV, 2022 WL 5125206, at *14 (Tex. App.—Austin Oct. 5, 2022, no pet. h.) (mem. op.) (concluding that parent's allowing other parent to be alone with child despite knowing supervision was required endangered child); *In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.) (considering parent's allowing children to be around drug dealer and parent while they used drugs and parent's supervision of children while under the influence in endangering-conduct analysis); *In re W.D.W.*, 173 S.W.3d 607, 612 (Tex. App.—Dallas 2005, no pet.) (considering in endangerment analysis the parents' allowing drug users to babysit child for long periods of time).

After the Department removed the children and the trial court ordered Father to complete services, he did not.  In fact, all he did was attend two parenting classes

20

before his unsuccessful discharge. His failure to attend BIPP, to complete a drug assessment, and to complete drug testing is particularly troublesome given his history of drug-related crimes and his history of volatility with Mother, the very evidence he seeks to downplay. The trial court could have properly considered Father's failures as endangering conduct. *See S.W.*, 2022 WL 3652489, at *4 (considering failure to attend anger management classes and failure to complete required drug testing as endangering acts of conduct).

Finally, after the children's removal, Father made no effort to visit the girls—to whom he now seeks to retain his parental rights—for more than two years after the case began. The trial court could have properly considered his not visiting them endangering conduct. *See M.K.*, 2020 WL 1949629, at *6.

Having reviewed all the evidence according to the proper standards of review, *see Z.N.*, 602 S.W.3d at 545 (providing legal-sufficiency standard of review); *C.H.*, 89 S.W.3d at 18–19, 28 (providing factual-sufficiency standard of review), we hold that the evidence is legally and factually sufficient to support the trial court's endangering-conduct finding against Father. We overrule his second issue.

Because a finding of only one ground alleged under Section 161.001(b)(1) is sufficient to support termination when accompanied by a best-interest finding, *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003), we do not reach Father's first issue challenging the sufficiency of the evidence supporting the endangering-environment finding. *See* Tex. R. App. P. 47.1.

21

**B. Factually Sufficient Evidence of the Best-Interest Finding Against Mother**

In her sole issue, Mother challenges the trial court's finding that termination of her parental rights is in the girls' best interest. Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

    (A)    the [child's] desires . . . ;

    (B)    the [child's] emotional and physical needs[,] . . . now and in the future;

    (C)    the emotional and physical danger to the child now and in the future;

    (D)    the parental abilities of the individuals seeking custody;

    (E)    the programs available to assist these individuals to promote the [child's] best interest . . . ;

    (F)    the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;

    (G)    the stability of the home or proposed placement;

(H)     the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)     any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

Mother contends that (1) an absence of evidence regarding the girls' desires, present needs, and future needs; (2) insufficient evidence of her inability to meet those needs; (3) insufficient evidence of the stability of the girls' proposed placements; and (4) positive evidence of her substantial completion of her service plan result in evidence that is factually insufficient to support the best-interest finding against her. But the endangerment evidence that Mother does not challenge is the most significant evidence against her; it drives our analysis. The trial court could have properly found that despite her completion of some service plan requirements, Mother had endangered the girls, returning them to her care would place them at high risk of present and future danger, and her inability to stay off drugs would prevent her from

23

meeting their needs and would destabilize their lives. Factually sufficient evidence supports the best-interest finding.

### 1. The Dangers Associated with Returning the Girls to Mother

The CPS investigator testified that Mother endangered the children by exposing them to drugs and by not supervising them adequately. Mother was 36 years old at trial and had eight living children, none of whom were in her custody. The chief reason for that was her chronic drug abuse.

The trial court could have properly found that Mother continued to abuse drugs after the children's removal. Although she denied doing so, the trial court could have properly inferred otherwise from the evidence of Mother's post-removal positive drug tests, Kayla's and Catherine's positive drug tests, and the evidence that cocaine metabolite, a substance for which Mother and Catherine tested positive, showed ingestion, not just proximity.[11] Mother's inability to permanently break her cycle of drug abuse even in the face of losing her relationship with her children created an unacceptable danger of present and future risk to the girls should they be returned to her. *See M.R.J.M.*, 280 S.W.3d at 502; *R.W.*, 129 S.W.3d at 739. Whether the trial court found that Mother persistently used drugs or persistently frequented drug

---

[11]Even if the trial court did not find that Mother used cocaine after the removal of the boys, Carrie, and Sarah, the trial court could have reasonably found that Mother's positive hair strand tests showed that she persisted in frequenting places where people used drugs or in spending time with drug users and that Catherine's positive drug test showed that Mother took her along.

24

environments or both, the evidence was factually sufficient to support a finding that returning the girls to Mother's care would endanger them.

The evidence also revealed multiple instances of Mother's failure to adequately supervise the children. For example, the trial court could have found that Mother endangered the children regarding the gun that killed Timothy. Although the evidence conflicted, the trial court could have properly inferred from the evidence that Mother knew the loaded gun was on top of the refrigerator when she put the candy there, endangering the children by allowing the loaded gun to remain accessible to them. *See In re Z.M.*, 456 S.W.3d 677, 686–87 (Tex. App.—Texarkana 2015, no pet.) (holding parent failed to ensure children's safety by allowing loaded gun to remain accessible to children). Alternatively, even if the trial court believed that the loaded gun had been put on top of the refrigerator in the intervening hours between Mother's placing the candy there and Timothy's retrieving the gun, the trial court could have properly concluded that she failed to adequately ensure the safety of the four young children by failing to adequately supervise them or by failing to ensure an appropriate person was doing so. *See A.O.*, 2022 WL 1257384, at *10 n.21 ("Even if [m]other had been sleeping instead of focusing on her phone, this only identifies a different cause for her failure to properly supervise her [c]hildren. It does not excuse her behavior."). Mother also admitted that she had allowed Grammie to watch the children even though she knew Grammie was under the influence of cocaine and heroin. The trial court could have properly found that Mother endangered the

children by doing so. *See S.W.*, 2022 WL 5125206, at \*14; *T.N.*, 180 S.W.3d at 383; *W.D.W.*, 173 S.W.3d at 612. Although Mother had completed parenting classes and testified that she no longer saw Grammie, Mother's continued drug abuse justified the trial court's finding that returning the girls to her would endanger them.

### 2. The Girls' Bonds and Needs and the Instability Mother Offered

The oldest of the three girls, Carrie, was almost five years old at trial; she and her younger sisters were all too young to express their desires. *See In re A.P.*, No. 10-22-00008-CV, 2022 WL 1417356, at \*2 (Tex. App.—Waco May 4, 2022, no pet.) (mem. op.) (holding same about five-year-old); *In re E.R.*, No. 01-17-00503-CV, 2017 WL 5892402, at \*11 (Tex. App.—Houston [1st Dist.] Nov. 30, 2017, pet. denied) (holding four-year-old was too young to testify about her desires).

In cases where children are not old enough to express their desires, "the factfinder may consider whether they have bonded with their foster parent and have spent minimal time with the parent." *In re J.G.*, No. 02-21-00020-CV, 2021 WL 2966165, at \*9 (Tex. App.—Fort Worth July 15, 2021, no pet.) (mem. op.); *In re J.V.*, No. 02-19-00392-CV, 2020 WL 1540865, at \*6 (Tex. App.—Fort Worth Apr. 1, 2020, no pet.) (mem. op.); *In re S.R.*, 452 S.W.3d 351, 369 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Carrie was two and one-half years old and Sarah was not yet a year old when the Department removed them and filed the petition. By the time of trial, roughly two and one-half years had passed with Carrie and Sarah living together with fictive kin and then in a foster home. Catherine lived with Mother less than six

26

months before her removal and had been in a dual foster-adoptive home ever since; she was two years old at trial. The trial court heard that Catherine was very bonded with her foster family, had lived only with them after her removal, and had thrived developmentally in their care. The caseworker believed that Catherine should stay put. If they retained custody, Catherine's foster family would want her to continue to have contact with her siblings.

Carrie and Sarah lived together in a different foster home than Catherine. The foster parents did not want to adopt because they were older and concerned about their health. "[T]hey wanted the [two] girls to have someone that's younger and able to keep up with them energetically." "It's not that they d[id not] want [Sarah and Carrie] long term." The caseworker testified that the sisters were "doing pretty well" in the foster home, where they had lived "for quite a while." They were receiving play therapy, occupational therapy, and speech therapy. Carrie was "doing very well" in pre-K and Sarah was "doing good" in daycare but having "some problems" and "getting . . . in[to] trouble" because she was copying Carrie's behaviors. The caseworker testified about how Carrie and Sarah had improved since the removal. Sarah's speech and interactions had both "taken off." They had both caught up on their medical care and had "really blossomed."

Although the girls spent more time with their foster parents than with Mother, Mother visited with the girls regularly, and the trial court heard no negative evidence about those visits. The trial court also heard about Catherine's bond with the siblings

27

she saw in the supervised visits with Mother. The caseworker testified that Catherine was "very happy to see her siblings," that she loved them, that she would run to greet them, that she knew their names, and that she had "a sibling bond with them." From the regular visitation, the absence of any negative evidence about the visits, and evidence of the positive bond between Catherine and her siblings, the trial court could infer some positive attachment between Mother and the girls.

The trial court heard evidence that Mother had an apartment and that the caseworker had visited the apartment multiple times and had no safety concerns about it. Mother had also completed parenting classes. But the caseworker nonetheless testified that Mother could not provide a safe and stable home because she had "continue[d] her pattern of using substances, abusing substances, children being born positive for substances, [and] continu[ed] a relationship with [Father] who ha[d] not addressed any of the safety concerns around the case for reason for removal." The trial court could have inferred from Mother's pre-removal and post-removal conduct that she did not have the ability to meet the girls' current and future needs. *See In re R.H.*, No. 02-19-00273-CV, 2019 WL 6767804, at \*5 (Tex. App.—Fort Worth Dec. 12, 2019, pet. denied) (mem. op.); *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.— Houston [14th Dist.] 2014, no pet.).

The trial court heard evidence of a placement Mother had suggested. The Department rejected the placement because of a history of drugs and criminality. The Department planned to simultaneously search for appropriate relative placements and

pursue nonrelative adoption of the girls together. However, the girls had been in their placements long enough to thrive, and the trial court could infer from the Department's removal of the children from their parents and rejection of the placement Mother suggested that the girls' foster parents engaged in neither criminal activity nor drug abuse. Thus, the trial court could have reasonably found that the girls' placements were more stable than any alternative Mother offered. While a single permanent placement for all three girls with a suitable relative would be ideal, "'it is not a bar to termination that placement plans are not final or that placement will be with nonrelatives.'" *In re S.C.*, No. 02-18-00422-CV, 2019 WL 2455612, at *8 (Tex. App.—Fort Worth June 13, 2019, pets. denied) (mem. op.) (quoting *In re R.A.*, No. 02-18-00252-CV, 2019 WL 490121, at *9 (Tex. App.—Fort Worth Feb. 7, 2019, no pet.) (mem. op.)).

### 3. Mother's Service Plan Progress

Mother made some progress on her service plan. The evidence showed that Mother visited the children regularly. Mother had completed her parenting classes and Safe Haven classes, and the Department accepted the drug outpatient services that Mother completed through her community supervision. Mother also testified that she had not committed criminal offenses during the case, that she had secured a full-time job, that she had completed counseling, that she had attended Alcoholics Anonymous and Narcotics Anonymous, and that she had tried to comply with court-ordered drug testing but did not have enough hair or nails and was allergic to the

29

sweat patch tape. In her brief, Mother characterizes her performance of the service plan as substantial compliance.

The caseworker testified that Mother did not successfully complete the service plan. Mother consistently offered excuses for not submitting to drug testing when asked. When the Department was considering a monitored return, Mother did not have enough hair or nail for drug testing. In March 2021, the caseworker asked Mother to get a hair strand test by the end of the week. Mother did not. Mother supplied no medical records to prove that she was allergic to the sweat patch tape.

Mother also did not supply any objective proof of her job, such as check stubs or employment letters. Further, Mother revoked her consent for the caseworker to get counseling records, so the caseworker was unable to get them. This was particularly troublesome because the counselor had reported concerns to the caseworker in a telephone call.

Mother also did not follow MHMR recommendations. Mother told the caseworker

> that she had to be compliant with MHMR as part of her [community supervision.] She had to attend follow-ups with her mental health provider as well as [take] Latuda because MHMR recommended it.
>
> She said that once she graduated from one specific part of [community supervision], she felt that she was free to then say and admit that she hadn't been taking Latuda at all and that she had lied to [the caseworker] previously as well as [community supervision.]

Later, Mother told the caseworker that she had stopped taking the medicine because of her pregnancy with Catherine. However, when Mother was pregnant with Kayla, Mother told the caseworker that "she didn't like the way it felt" when she was on Latuda, that the only reason she "was taking it was [to] . . . get [her] kids back," and that if the Department was going to seek termination, she would not take the medication anymore. Mother did not mention her pregnancy with Kayla as a reason not to follow MHMR's recommendation.

Although evidence showed that Mother had completed some steps of the service plan, her missed drug tests, failed drug tests, excuses to delay tests, failure to supply objective proof, withholding of medical and counseling records, and refusal to follow MHMR recommendations could have led the trial court to find that Mother had gone through the motions in completing her service plan but had not made lasting changes to benefit her children. *See In re JHG*, 313 S.W.3d 894, 899 (Tex. App.—Dallas 2010, no pet.).

### 4. Resolution

The trial court could have reasonably based its best-interest finding on Mother's pre-removal drug abuse and her decision to continue the pattern after the removals, even in her pregnancy with Kayla, and could have reasonably determined that the continuing drug abuse overshadowed any evidence in Mother's favor. *See In re M.D.*, No. 02-14-00305-CV, 2015 WL 729506, at *10 (Tex. App.—Fort Worth Feb. 19, 2015, no pet.) (mem. op.).

31

Having reviewed all the evidence according to the proper standard of review, *see C.H.*, 89 S.W.3d at 18–19, 28 (providing factual-sufficiency standard of review), we hold that the evidence is factually sufficient to support the trial court's best-interest finding against Mother and the termination of her parental rights to the girls. We overrule Mother's sole issue.

## V. CONCLUSION

Having overruled Mother's only issue and Father's second issue, which is dispositive, *see* Tex. R. App. P. 47.1, we affirm the trial court's judgment.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: December 22, 2022